# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-19-0036** |
| | * | |
| **CORREY CAWTHORN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\***

## OPPOSITION TO MOTION FOR RELEASE

On May 13, 2020, the defendant filed a motion for a detention hearing pursuant to 18 U.S.C. § 3142. ECF 426. The defendant previously consented to detention, as his initial appearance occurred during the time he was held in state custody pending charges.. ECF 101. He is currently held at the Chesapeake Detention Facility ("CDF"), which is where he has been since his arrest following a two month period of knowing noncompliance with and avoidance of the Court's detention order, discussed further below. The defendant now files for a hearing to be released pending trial.

The defendant's request should be denied because detention remains appropriate under all relevant Bail Reform Act considerations. The defendant poses a grave danger to the community and is a flight risk. First, the defendant is a member of a dangerous group that routinely carried, traded, and touted their connections to firearms and violence in the Darley Park community in Baltimore City. Second, the defendant absconded from custody for approximately two months when Baltimore County accidently released him instead of honoring a federal detainer. The defendant spent two months evading apprehension, posting videos and comments on social media mocking "the feds" for being unable to catch him. During this period, the defendant also appeared in another federally indicted defendant's social media accounts holding an assault rifle.

The government will show that there are no conditions of release that will ensure the safety of the community and guarantee the defendant's appearance in court. Accordingly, the Court should continue the order of detention.

## Background

On January 24, 2019, a federal grand jury sitting in the District of Maryland issued a 14-count Indictment charging the defendant and 15 others with narcotics and firearm violations. ECF 1. The defendant was specifically charged with Conspiracy to Distribute and Possess with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. § 846 (Count 1); Conspiracy to Possess Firearms in Furtherance of Drug Trafficking, in violation of 18 U.S.C. § 924(o) (Count 2); and Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841 (Count 8).[1] On February 7, 2020, the defendant had an initial appearance, arraignment, and consented to detention. ECF 90, 91 and 101, respectively.

The defendant returned to the custody of the Baltimore County Detention Center after his appearance in federal court. At the time, the defendant was held without bail for an Attempted First Degree Murder charge stemming from a non-fatal shooting on August 11, 2018.[2] Subsequently, the victim refused to testify against the defendant in state court. The case was dismissed on March 28, 2019. The defendant should have been transported to a federal detention facility pursuant to the Court' detention order. *See* ECF 101. Instead, on or about April 1, 2019, the defendant was released by the state authorities.

The defendant did not notify the marshals of his release; he did not appear in court; he did turn himself into local authorities; he did not call his counsel to facilitate self-surrender. He did

---

[1] A federal grand jury returned a Superseding Indictment on December 5, 2020, which added one co-defendant. There were no changes or additions made to the charges against the defendant. ECF 276.

[2] Baltimore County Circuit Court case number 03-K-18-004009.

none of these things despite acknowledging—on recorded jail calls and in text messages with associates—that he knew he was supposed to be in federal custody and self-surrender. Rather, the defendant flaunted his ill-gotten freedom on Instagram in April 7, 2019:



Cawthorn continued to post as he continued to abscond, as seen below (and re-tweeted by a follower on June 2, 2019, three days after the U.S. Marshals arrested Cawthorn):



In this post, the defendant raps about how he is wanted by the federal government but they cannot get him. He reiterates his point by captioning the post as "Feds want me so bad but they don't have a clue They lost".

Moreover, the defendant spent his the spoils of his erroneous release to resume his attachment to firearms. On or about May 11, 2019, the defendant is featured in a video with Rashaud Nesmith[3] and associates wearing masks in a homemade rap video, depicted in stills below. Cawthorn is on the far left in a white t-shirt and mask up to his eyes, holding what appears to be an assault rifle. Agents familiar with Cawthorn have positively identified Cawthorn. Cawthorn is not pictured in the last still, but it appears the assault rifle held by Cawthorn is held by an associate.



Cawthorn features prominently in another video posted by Nesmith during the time Cawthorn absconded from federal detention. On April 14, 2019, Nesmith posted a video of himself and Cawthorn flashing cash. In the video Cawthorn references "Triple C" which is the gang he is associated with, as explained below. Agents familiar with both Nesmith and Cawthorn positively

---

[3] Nesmith is charged in a separate indictment for RICO conspiracy, carjacking, and use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 1961, 2119, 924(c). *See* SAG-19-486.

identified both in the video. Nesmith is in the still to the far left and Cawthorn is featured in the stills in the middle and right:



Meanwhile, the Court issued an arrest warrant for the defendant April 11, 2019 after being advised of his release. ECF 140. Cawthorn knew he was wanted; in fact, he told co-defendant Anthony Dinkins during a recorded jail call that he (Cawthorn) was in North Carolina even though he was supposed to be in federal custody. In other recorded jail calls, Cawthorn discussed with Dinkins and co-defendant Devonta McCrorey that his family and attorney urged him to surrender.

But he never did. The Marshals arrested the defendant on May 31, 2019, after he was arrested by local authorities for an unrelated offense. ECF 164. The defendant has been detained since this date. On May 12, 2020, the defendant filed a motion for release. ECF 426.

## <u>Argument</u>

The defendant is accused of serious and dangerous crimes with 16 co-defendants; the government is entitled to a presumption based on the drug trafficking charges against them. Cawthorn also absconded from custody for two months. He obtained firearms and associated with at least one other individual who is under federal indictment for violent crimes during this two month period. Cawthorn has offered no conditions for pre-trial release. And that is because there are no conditions of release that can protect the community or guarantee the defendant's presence in court. Because the basis for the defendant's request is unclear, the government also addresses

why the COVID-19 event does not warrant release on these facts, and reserves the right to provide additional argument based on any future arguments by the defendant.

## I.      Legal Standard

The Court must consider the factors laid out in 18 U.S.C. § 3142 in determining whether a defendant poses a danger to the community and/or flight risk. These factors include: "(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . a controlled substance [or] firearm; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . . ; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Because of the nature of the charges against the defendant, the Government also is entitled to a presumption that no combination of release conditions will assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A).[4]

The government need demonstrate risk of flight by only a preponderance of evidence, while risk of danger requires clear and convincing evidence. *United States v. Stewart*, 19 F. App'x 46, 48-49 (4th Cir. 2001) (citations omitted).

## II.      The § 3142 Factors Weigh Heavily in Favor of Detention.

Detention remains appropriate under all of the circumstances before the Court. An examination of the § 3142 factors demonstrates that the detention order should remain in place.

---

[4] The Bail Reform Act permits the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). The defendant does not argue this point in his request for a detention review. To the extent defendant seeks release on this basis, the government requests additional time to brief this issue if the defendant provides evidence of a "compelling reason" such as records related to a medical condition. The government further notes that the request does not claim release based on the COVID-19 event, nor does the defendant specify any discernable medical condition that requires release.

## A. The Nature and Circumstances of the Offense and Weight of the Evidence

The charges in this case arise from activities of a drug trafficking organization operating in and around the Darley Park area of Baltimore City.[5] The activities include drug trafficking, unlawful possession of firearms, and acts of violence, including multiple shootings (one of which is charged). The grand jury's return of the Indictment shows probable cause to believe that the defendant violated the Controlled Substances Act. Specifically, the grand jury charged the defendant with participating in a conspiracy to distribute 280 grams or more of cocaine base (commonly known as crack cocaine), in addition to conspiracy to possess a firearm in furtherance of drug trafficking and substantive distribution of crack cocaine. The general nature of the conspiracies is reflected by the organization's sales of drugs during an eight-month investigation— including more than a dozen controlled purchases by federal agents—as well as communications between the defendants regarding drug trafficking, access to and use of firearms to protect trafficking and enforce trafficking territorial boundaries, and acts of violence against rivals and other persons not within the organization. Some of these communications reflect defendants providing access to firearms for other defendants (including Cawthorn) for the purpose of facilitating drug trafficking and committing robberies. Multiple defendants were arrested in possession of firearms and/or narcotics, and others have been tied to firearms, some of which have been identified as stolen or having an obliterated serial number.

During the investigation, federal agents used combination of video surveillance, physical surveillance, and controlled purchases in the Darley Park neighborhood. The defendant was seen

---

[5] This area lies southwest of Clifton Park, bordered on the west by Harford Road, to the south by Darley Avenue, and to the east by N. Wolfe St. The area includes the 1400-1700 blocks of Normal, Darley, and Cliftview avenues.

in the Darley Park area during the investigation, at times with co-defendants involved in controlled purchases and/or charged with firearms possession or substantive possession with intent to distribute charges. Investigators learned from confidential informants developed during the course of the investigation that the drug shop had designated areas where firearms were stashed. The defendant's behavior was consistent with this pattern.

On August 3, 2018, the defendant provided crack cocaine to another co-defendant who in turn sold it to an undercover agent. The transfer from the defendant to his co-defendant is caught on surveillance video; in addition, the sale to the undercover officer is also caught on video.

But the defendant's role in the organization is more of an enforcer, rather than a street-level hitter, and the evidence of such is substantial. The defendants are part of an organization that uses the moniker "Triple C" or "CCC". Social media pages feature pictures of Cawthorn and a number of the co-defendants, many of whom wear "CCC" apparel. One of Cawthorn's co-defendants, Gary Creek, was wearing a shirt bearing "CCC" at the time of his arrest. Creek's own social media page identifies him at a "founder of CCC" and includes photos of Cawthorn and other defendants. For example, Cawthorn and co-defendant Desean Johnson are seen in this photo in matching "CCC" sweatshirts:



Cawthorn's enforcer role is evident in numerous photographs and text messages uncovered on Cawthorn's phone, which was seized from Cawthorn during his arrest by Baltimore County law enforcement for the aforementioned August 2018 non-fatal shooting. Agents received a search warrant for the phone and uncovered a treasure trove of Cawthorn with firearms and other co-defendants with firearms. Below are a sample of the photos recovered:





The photo below is of Cawthorn and other co-defendants, including Domaneek Bradley, to whom Cawthorn supplied drugs in advance of that August 2018 undercover purchase. The photo was taken in drug shop territory.



Below are photos of multiple firearms found on Cawthorn's cellphone. Confidential informants and witnesses confirm that Cawthorn always had a firearm on his person and may have been a source of supply for "Triple C" and others in the drug shop operations.



<u>Text messages regarding firearms.</u>  On June 8, 2018, Cawthorn received a video from Creek. In the thirty-eight second video, there appear to be eight distinct firearms laid out on a floor, with the camera panning from one to another, while the speaker (Creek) referred to the

recipient as "big man" (photos of Cawthorn reflect his noticeable girth) and says "no fucking games" while presenting the weapons.



Approximately fifty seconds later, Cawthorn conveyed his interest by responding "I'm trying to trade my g for the tan g," in which investigators believe "g" is short for gun. Indeed, at least one of the firearms, which was wrapped in plastic, appeared to be a tan or light brown color.



One week later, on June 15, Cawthorn asked via text, "Or will he take these," after which he sent multiple pictures of firearms.

 

The government submits that these exchanges, while one week apart, should be viewed as part of an ongoing dialogue. But even when viewed in isolation from one another, they still reflect Cawthorn's involvement in possessing and trafficking firearms.

Cawthorn attempted to sell a firearm on May 19, 2018, texting an associate:



On August 12, 2018, Cawthorn, using telephone number 443-500-7088 (the telephone recovered from Cawthorn during his arrest in August) texted "Shawn" that he needed a firearm (the "ratchet") and asked "Shawn" to bring it to him:



Cawthorn makes the same request for firearms (the "high point" and "dillinger") on August 16, 2018:



Cawthorn's text messages also show he knew the drug shop kept firearms in the area for protection. On or about June 11, 2018, agents recovered a firearm off the porch of a stash house associated with the shop. Cawthorn, again using telephone number 443-500-7088 texted co-

defendant Diontaye Demory (also known as "Grilla", hence the "G" saved in connection with the phone number) that the police ("Jake") took a firearm "rachet" off the block where the drug shop operated

> Read: 6/11/2018 9:02:37 PM(UTC+0)
>
> 6/11/2018 9:02:51 PM(UTC+0)Direction:Outgoing, +14435007088
> Jake took a rachet off the block
> Status: Sent
> Delivered: 6/11/2018 9:02:51 PM(UTC+0)
>
> 6/11/2018 9:45:06 PM(UTC+0)Direction:Incoming, +14432100762 (G)
> Yeah

The meaning of this exchange is corroborated by footage, taken from a pole camera, showing that Demory carried a backpack and deposited it in front of a vacant residence where the defendants sold narcotics, and, after Demory left the area, Baltimore Police Department officers recovering the same backpack.  Recovered from that backpack were a firearm and marijuana packaged for distribution.

Text messages regarding violence.  Cawthorn frequently texted gang members about committing acts of violence.  For example, on May 16, 2018, Cawthorn discussed a shooting that occurred in which he was grazed:

> 5/16/2018 3:09:25 AM(UTC+0)Direction:Incoming, +14103014517 (Best )
> CORREY WHATS WRONG WITH YOU !!
> Status: Read
> Read: 5/16/2018 3:10:30 AM(UTC+0)
>
> 5/16/2018 3:10:41 AM(UTC+0)Direction:Outgoing, +14435007088
> I fucked my shit up
> Status: Sent
> Delivered: 5/16/2018 3:10:41 AM(UTC+0)
> Read: 7/13/2018 4:58:36 AM(UTC+0)
>
> 5/16/2018 3:11:34 AM(UTC+0)Direction:Incoming, +14103014517 (Best )
> HOW YOU FUCKED IT UP ?
> Status: Read
> Read: 5/16/2018 3:13:25 AM(UTC+0)
>
> 5/16/2018 3:11:51 AM(UTC+0)Direction:Incoming, +14103014517 (Best )
> I KNOW YOU AINT GET SHOT !!
> Status: Read
> Read: 5/16/2018 3:13:25 AM(UTC+0)
>
> 5/16/2018 3:13:37 AM(UTC+0)Direction:Outgoing, +14435007088
> I got graze
> Status: Sent
> Delivered: 5/16/2018 3:13:37 AM(UTC+0)
> Read: 7/13/2018 4:58:36 AM(UTC+0)

Agents know there was a shooting the day before this text exchange in the 5500 block of Bowley's Lane. Agents believe that Cawthorn was present during the shooting and was injured.

On July 22, 2018, Cawthorn "promises" that people will die. In response, both members "loved" the image:

Other evidence. During the investigation, federal agents used combination of video surveillance, physical surveillance, and controlled purchases in the Darley Park neighborhood. Cawthorn was frequently seen in the Darley Park area during the investigation, at times with co-defendants who were involved in controlled purchases and/or charged with firearms possession or substantive possession with intent to distribute charges. There are also three confidential informants/witnesses that will testify regarding acts of violence and drug dealing they either personally saw, were involved in with Cawthorn, or heard Cawthorn discuss.

## B. History and Characteristics of the Person

The defendant has a history of firearms offenses. In 2016, at the age of 17, the defendant was found involved on the charge of wear, carry, transport, a handgun, and sentenced to a period of juvenile probation. As an adult, the defendant has a conviction for illegal dirt bike riding in 2017 and later served 30 days in jail for a motor vehicle conviction in 2017. These crimes appear to be minor and perhaps not even worth mentioning in the context of a defendant in a federal drug indictment, but their repeated occurrences speak to the unlikelihood that he would comply with any conditions of pre-trial release. Moreover, the defendant's most serious arrest, a non-fatal

shooting in August 2018, which occurred during the instant matter, was dismissed not for actual innocence, but because the victim refused to testify.

Perhaps most telling is the defendant's sheer disregard for the law while he knowingly absconded for two months. He did not simply abscond. He mocked the legal system. He held what appears to be an assault rifle with others holding firearms. He admitted he knew he should surrender, but refused to do so. Ironically, law enforcement finally captured Cawthorn when he was arrested for illegal dirt bike riding. Cawthorn has a track record *in this case* of disregarding court orders. There is no reason to think that will change now.

> **C.** **The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release**

The government submits that the defendant's involvement in drug and firearms possession and trafficking presents a substantial risk of danger to the communities in which he has been seen and those to which he has been attached by sources of information. Threats to individual members of the community are particularly relevant here, where some of the information regarding the defendant's involvement in the activity is based on confidential information provided by private citizens. The defendant's involvement in this investigation involves association with individuals who have sold controlled substances, been charged with firearms possession, and/or have been involved in acts of violence, not to mention his own implication in multiple acts of violence. A number of defendants have also been implicated in acts of violence associated with the group. For example, Anthony Dinkins is charged in this case with a discharging arising from a non-fatal shooting of a rival drug trafficker. Also, Richard Grier was charged and convicted in the Circuit Court for Baltimore City for a murder of a rival drug trafficker at a gas station on the edge of Darley Park and the group's asserted territory.

The defendant's release would pose a serious risk to the community in the form of handgun violence and/or damage to the public health through the distribution of dangerous guns. As the Court noted in a recent opinion denying a motion for pretrial release based on COVID-19, "Baltimore City had nearly 350 homicides in 2019—almost 60 per every 100,000 citizens. There were more than 700 nonfatal shootings. According to the Maryland Department of Health and the Office of the Chief Medical Examiner, there were almost 1000 additional deaths attributable to heroin, fentanyl and/or opioid overdose." *United States v. Gibson-Bey*, RDB-19-0563 (D. Md.), ECF 26, at 3 (internal citations omitted). These are risks that the Court must weigh in determining whether there are release conditions that can assure community safety.

### III. The COVID-19 event does not favor release of this defendant.

The defendant may argue the health risks posed by COVID-19. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). As an initial matter, a recent opinion of the Court noted that unless a medical condition will reduce the risk of flight or danger, that medical condition does not impact any analysis under § 3142(f)-(g). *United States v. Owens*, SAG-20-0056 (D. Md. May 4, 2020), slip op. at 4. Notwithstanding the COVID-19 outbreak, this factor does not weigh heavily, if at all, in favor of the defendant's release. The defendant's motion does not allege that he has COVID-19 or been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* "physical and mental health." Instead he relies solely on the *possibility* of becoming infected.

This Court has recently denied similar claims by detainees housed in the Chesapeake Detention Facility.[6] Because the defendant's anticipated generic argument runs counter to the

---

[6] *See, e.g., United States v. Martin*, PWG-19-140 (D. Md. Mar. 3, 2020), ECF 209 (Order by Judge Grimm); *United States v. Blue,* ELH-19-0286 (D. Md. Mar. 31, 2020), ECF 413 (Order by

individualized determination required by the Bail Reform Act, and because the defendant has

failed to make a sufficient factual showing to merit the relief sought in his request for release, this

Court should continue the order of detention.

### A. Officials Have Established Comprehensive Health Measures at CDF to Avoid a COVID-19 Outbreak.

As of this filing, the government is aware of only one confirmed case of COVID-19 at

CDF in the detainee population. As discussed below, however, CDF has implemented

substantial precautionary measures to mitigate risks of transmission.[7] The Maryland Department

of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of

precautionary measures to limit the risk of COVID-19 transmission into and inside CDF.[8]

DPSCS represents that it is committed to providing all necessary precautionary measures and

supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative

---

Magistrate Judge Gesner); *United States v. Ashley,* RDB-06-0034 (D. Md. Apr. 6, 2020), ECF 107 (Order by Judge Bennett); *United States v. Jones*, RDB-18-0339 (D. Md. Apr. 17, 2020), ECF 588 (Order by Judge Bennett); *United States v. Gollahon*, DKC-19-257 (D. Md) (Order by Magistrate Judge Copperthite), ECF No. 85; *United States v. Hackett*, GLR-18-0086 (D. Md) (Order by Judge Russell), ECF No. 144; *United States v. Crosby*, ELH-19-268 (D. Md) (Order by Magistrate Judge Copperthite), ECF No. 415; *United State v. Gallagher*, SAG-19-479 (D. Md.) (Order by Magistrate Judge Boardman), ECF No. 14; *United States v. Anderson*, ELH-19-302 (D. Md.)(Order by Judge Hollander), ECF No. 79; *United States v. Hill*, TDC-20-046 (D. Md.) (Order by Magistrate Judge Copperthite), ECF No. 144; *United States v. Legard*, PWG-19-0137 (D. Md.) (Order by Judge Grimm) ECF No. 520; *United States v. Ellison*, ELH-19-286 (D. Md.) (Order by Judge Copperthite), ECF No. 427; *United States v. Waller*, GLR-19-86 (D. Md.) (Order by Judge Russell), ECF No. 143; *United States v. Solomon*, ELH-10-286 (D. Md.) (Order by Magistrate Judge Copperthite), ECF 454.

[7] The following individuals have provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; (4) DPSCS Lieutenant Nina Riser; and (5) Jessica Dempsey, DPSCS Director of Nursing, Occupational Health, and Safety.

[8] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

actions advised by the Centers for Disease Control and Prevention ("CDC") and Maryland Department of Health ("MDH") regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulted in a state of emergency. Accordingly, DPSCS has employed various measures at CDF, including screening procedures, limits on social visitation and new detainees entering the facility, separation of detainees 50 years of age and older, enhanced sanitation and hygiene protocols, and quarantine protocols.[9] Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

---

[9] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

Along with the above, DPSCS has issued a series of memoranda, directives, and notices of standard operating procedures to limit any spread of the COVID-19 virus in its facilities, including the Chesapeake Detention Facility.

Records provided by CDF also reflect that the facility is making efforts to implement the aforementioned policies. An inspection was conducted at CDF, and the inspection reports indicate that CDF is taking reasonable, appropriate precautions and is making a reasonable effort to implement the COVID-19 policies discussed above. Specifically, the CDF audit found, among other things, that the facility was properly screening individuals entering the facility, staff were maintaining appropriate social distancing, and that staff were making use of PPE. The Environmental Compliance Safety Officer (ESCO) walk-through audit reported that the facility has appropriate signage throughout the facility, staff were appropriately using PPE, cleaning supplies were available, and social distancing was being maintained. The Intelligence and Investigation Division audit, likewise, found that staff members were appropriately using PPE, social distancing guidelines were being followed, and individuals entering the facility were being appropriately being screened.

In sum, the information, policy documents, and audit/inspection reports set forth above indicate that DPSCS and CDF have prepared reasonable measures to address the COVID-19 situation, and are making reasonable efforts to enforce those policies.

**B. The Defendant's Individual Circumstances Do Not Merit Release.**

While the COVID-19 virus is new, health claims by detainees are not. Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 Fed. App'x 726, 728 (10th Cir. 2008). These cases recognize that reasonably

necessary treatments may be available in prison, *see United States v. Rodriguez*, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999), and a number of recent decisions of this Court have agreed. In this case, the defendant simply has not made a factual record that his medical needs will not be met while detained. Granting a defendant's motion for release based on the general threat of harm posed by COVID-19 to all flies in the face of the defendant-specific analysis required by 18 U.S.C. § 3142(f).

Furthermore, if the defendant proposes placement outside of the facility, it may not eliminate the danger of contracting COVID-19. *See United States v. Gray*, GJH-19-407, ECF No. 120 (recognizing "the unfortunate reality that public health officials are struggling to contain the spread of the virus in the general public as well"). The government notes that the defendant has provided no release plan as to how he would avoid or mitigate the risk of COVID-19 should he be released. Without the ability to detail who all lives in the suggested home as well as who all frequent said residence, and the ability to identify screening practices or concrete COVID-19 precautions at the residence, the limited and strictly enforced access to jails better "serves to minimize Defendant's COVID-19 exposure." *United States v. Smoot*, Crim. No. 2:19-CR-20, 2020 WL 1501810, at *3 (S.D. Ohio Mar. 30, 2020)."

There is also no evidence that the defendant can be trusted to adhere to the social distancing guidelines that are so necessary to protect not only his own health, but the health of the community. *See, e.g., United States v. McKenzie*, 18 Cr. 834 (PAE), ECF No. 457 (S.D.N.Y. April 6, 2020) (defendant who had been granted pre-sentence release based on the risk of becoming ill from COVID-19 immediately violated his release conditions and risked the health of his community by hosting a welcome-home party with numerous others). In fact, the evidence of his knowing evasion of arrest establishes that he cannot be so trusted.

**C.** **Traditional Location Monitoring Is No Longer An Option for Pretrial Services.**

Pretrial Services now has diminished ability to monitor defendants on home detention. Due to COVID-19, the Court has suspended traditional electronic home monitoring that relies on radio frequency or GPS to provide real-time information about a defendant's whereabouts. Although other forms of home detention are still available, "none provides 24/7 monitoring and notification." *Gibson-Bey*, RDB-19-563 (D. Md.), ECF 2, at 3 n.2. Accordingly, Pretrial Services' ability to ensure that defendants do not become a flight risk or pose a danger to the community has been significantly curtailed and in this case, since Cawthorn absconded for two months prior to detention, there are no conditions that will secure the safety of the community, or his appearance in court.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for release.

Respectfully submitted,

Robert K. Hur
United States Attorney

_____/s/_____
Patricia McLane
Charles Austin
Assistant United States Attorneys

Filed on ECF: May 14, 2020