**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB-19-036** |
| | * | |
| **CORREY CAWTHORN, et al.** | * | |
| | * | |
| **Defendants.** | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
<u>**IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**</u>

Robert K. Hur
United States Attorney

Patricia McLane
Charles Austin
Brandon Moore
Assistant United States Attorneys

36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-209-4800
Patricia.McLane@usdoj.gov
Charles.Austin@usdoj.gov
Brandon.Moore@usdoj.gov

August 20, 2020

## TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................... 5

    I.    Consolidated Response To Motions To Suppress Evidence Related To Warrantless Searches And Seizures ................................................................. 5

        A. Legal Standard ...................................................................................... 5

            1. Search and Tracking Warrants ........................................................ 5

            2. Warrantless Searches and Seizures ................................................ 7

        B. The Arrests and Seizures Challenged in Cawthorn's Motions Were Supported by Probable Cause or Were Otherwise Permissible Under the Fourth Amendment..... 9

            1. Investigators Properly Tracked Cawthorn's Cellphone Assigned  Number (443) 500-7088 and Searched His iPhone 7................................................. 9

            2. The Searches of Cawthorn's Person, Home at 3201 Massachusetts Avenue, and iPhone 8 Were Legal and Supported by Probable Cause ................................. 13

            3. The Warrantless Searches on September 4, 2017 and August 3, 2018 Were Constitutional and Supported by Probable Cause ............................................ 16

        C. The Seizures Challenged in Creek's Motions Were Supported by Probable Cause or Were Otherwise Permissible Under the Fourth Amendment........................... 18

            1. Agents Had Probable Cause to Track Creek's Phone Number as Evidence in the Appropriately Authorized Warrant............................................................ 18

            2. The Warrant Executed on Creek's Five Cellphones was Supported by Probable Cause ............................................................................................. 20

            3. The Warrant Authorizing the Search of Creek's Instagram Account Had Substantial Probable Cause ............................................................................ 22

        D. Officers had Probable Cause to Arrest Harris-Howell Without A Warrant and Property Seized from Harris-Howell Was Proper As it Resulted from a Search Incident to Arrest 25

        E.    Keishonne Moore's Search and Arrests were Supported by Probable Cause ................. 26

1.  Probable Cause Supported the Federal Warrant Authorizing the Search of Keishonne Moore's Phone ............................................................................. 27

2.  Baltimore City Officers had Probable Cause to Arrest Keishonne Moore on December 4, 2018, and the Seizure of Any Property was Constitutional ........ 28

II.   Consolidated Response To Motions To Suppress Statements ................................... 29

A. Legal Standard ...................................................................................... 30

B. Tunnell's Statements to Law Enforcement were Voluntarily Made Following the Proper Administration of Miranda Warnings ........................................................ 32

C. Cawthorn's Statements to Law Enforcement were Also Voluntarily Made Following Proper Miranda Warnings ................................................................... 33

D. Grier's Statements Were Also Voluntarily Made Consistent with Miranda ......... 36

E. Like His Co-Defendants, Harris-Howell's Statements to Law Enforcement Were Voluntarily Made Following the Proper Administration of Miranda Warnings After his Lawful Arrest .......................................................................... 38

III.   Consolidated Response In Opposition To Defendants' Motions To Sever Trial ....... 41

A. The defendants are properly joined pursuant to Federal Rule of Criminal Procedure 8(b). ..................................................................................... 43

B. Severance is not warranted given the admissibility of evidence against co-defendants in a single trial, notwithstanding differing degrees of culpability ....... 44

IV.   Consolidated Response To Motion For Disclosure Of Co-Defendant And Co-Conspirator Statements .................................................................................. 46

V.   Consolidated Response To Motion For Disclosure Of Evidence Pursuant To Federal Rules Of Evidence 404(B) And 609 ......................................................... 48

VI.   Consolidated Response To Motion For Disclosure Pursuant To Federal Rule Of Criminal Procedure 12 ................................................................................. 50

VII.   Consolidated Response To Motion To Review And Confirm Witness Backgrounds 52

VIII.   Consolidated Response To Motion For Bill of Particulars ........................................ 52

CONCLUSION ...................................................................................................... 55

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. CCB-19-036 |
| | * | |
| CORREY CAWTHORN, et al. | * | |
| | * | |
| Defendants. | * | |
| | ******* | |

GOVERNMENT'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

The United States of America respectfully submits this consolidated response in opposition to the pretrial motions filed by Defendants Correy Cawthorn (ECF Nos. 339–346, 454), Gary Creek (ECF Nos. 394–398, 428–429), Richard Grier (ECF Nos. 388, 389), Robert Harris-Howell (ECF Nos. 449-452), Keishonne Moore (ECF Nos. 377–379), and Alonzo Tunnell (Nos. 325–333).[1] For the reasons explained below, the Court should deny these motions.

## BACKGROUND

On December 5, 2019, a federal grand jury for the District of Maryland returned an indictment charging sixteen people with conspiracy to distribute 280 grams or more of cocaine base, a Schedule II substance, and a detectable amount of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 846 (Count One); and conspiracy to possess a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(o) (Count Two). *See* ECF No. 1.

---

[1] Desean Johnson, Anthony Dinkins, Davonte McCrorey, and Demetrius Moore also filed various motions to suppress and to adopt other defendants' motions. *See* ECF Nos. 383–387, 390–392, 399, 442–448. But they are scheduled to plead guilty on September 10, 2020 (Johnson); September 8, 2020 (Dinkins); September 15, 2020 (Moore); and September 22, 2020 (McCrorey). Therefore, the government believes their motions are moot. Should they choose not to plead guilty, the government requests additional time to supplement this response. Nevertheless, the response to substantively similar motions here would apply equally to their motions.

On December 5, 2019, a Superseding Indictment added Gary Creek to both Counts One and Two.

*See* ECF No. 276.  Certain defendants were also charged with the following offenses:

- Cawthorn:  distribution and possession with intent to distribute cocaine base (Count Eight);

- Harris-Howell:  two counts of distribution and possession with intent to distribute cocaine base (Counts Four and Seven); and possession of a firearm by a prohibited person (Count Nine);

- Keishonne Moore:  two counts of distribution and possession with intent to distribute cocaine base (Count Twelve and Fourteen); and possession of a firearm in furtherance of drug trafficking (Count Thirteen); and

- Tunnell: distribution and possession with intent to distribute cocaine base (Count Five).

As of this filing, the following defendants have either pled or are scheduled to plead guilty: Domaneek Bradley, Anthony Dinkins, Quamonta Jackson, Desean Johnson, Brittany Jones, Davonta McCrorey, Demetres Moore, Michael Reaves, Ronald Stevenson, and Carlton Thompson.  The remaining defendants are scheduled to proceed to trial on January 25, 2021.  The Court set a motions hearing for September 25, 2020.  Several pretrial motions remain outstanding, and many of the pending pretrial motions overlap or address similar issues.  Further, some of the defendants filed motions to adopt the pretrial motions of co-defendants.  Thus, where the relevant facts and legal issues overlap, the government attempts to address those motions together.

A chart of pending motions filed by each defendant follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| **Alonzo Tunnell** | Motion for Leave to File Additional Motions | 325 |
| | Motion to Adopt Motion of Other Defendant | 326 |
| | Motion for Disclosure of F.R.Cr.P. 12 Material | 327 |
| | Motion for Disclosure of F.R.Ev. 404 & 609 Material | 328[2] |
| | Motion for Disclosure of F.R.Ev. 801(d)(2(E) | 330 |

---

[2] Tunnell also filed a memorandum in support of the motion for disclosure.  *See* ECF No. 329.

| | Motion to Compel Prosecution to Review and Confirm Witness Backgrounds | 331 |
|---|---|---|
| | Motion to Suppress Statements | 332 |
| | Motion to Adopt Motions of Other Defendant *Generally* | 333 |
| **Correy Cawthorn** | Motion for Leave to File Additional Motions | 339 |
| | Motion to Adopt Motions Filed by Co-Defendants | 340 |
| | Motion to Sever | 341 |
| | Motion to Suppress Telephone and Tracking Warrant | 342 |
| | Motion to Suppress Arrest Warrant and Search Warrant from August 28, 2018 | 343 |
| | Motion to Suppress Statements | 344 |
| | Motion to Suppress Suggestive Identification | 345 |
| | Motion to Suppress Evidence Warrantless Arrest on August 3, 2018 | 346 |
| | Motion to Suppress Evidence of Warrantless Search on September 4, 2017 | 454 |
| **Keishonne Moore** | Motion to Suppress Search Evidence | 377 |
| | Motion to Suppress Arrest and Seizure of Evidence | 378 |
| | Motion to Adopt Motions Filed by Co-Defendants | 379 |
| **Richard Grier** | Motion to Suppress Statements | 388 |
| | Motion to Adopt Motion of Other Defendants | 389 |
| **Gary Creek** | Motion for Bill of Particulars | 394 |
| | Motion to Sever | 395 |
| | Motion to Adopt Motion of Other Defendant *Alonzo Tunnell ECF 328 and 330* | 396 |
| | Motion for Leave to File Additional Motions | 397 |
| | Motion to Suppress Fruits of Tracking Warrant from September 5, 2019 | 398 |
| | Motion to Suppress Search of Seized Phones | 428 |
| | Motion to Suppress Search of Social Media Accounts | 429 |
| **Robert Harris-Howell** | Motion to Suppress Statements | 449 |
| | Motion to Suppress Evidence Seized on August 20, 2018 | 450 |
| | Motion to Adopt Motion of Other Defendant | 451 |
| | Motion for Leave to File Additional Motions | 452 |

## **STATEMENT OF FACTS**

The defendants are members and associates of a drug trafficking organization that operated in Baltimore City, Maryland, including near the 1600 block of Cliftview and Normal Avenue, as well as Harford Road, an area commonly known as "Darley Park." Between May 2018 and December 2019, this organization distributed narcotics, including cocaine base, in Baltimore City.

Organization members were seen conducting hand-to-hand drug sales to customers in those areas. During their investigation, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Baltimore Police Department ("BPD") used a camera to surveille the organization. That video surveillance captured the defendants participating in the drug trafficking activities, like carrying out the hand-to-hand sales and delivering narcotics to organization members and associates for the purpose of facilitating drug trafficking activities. In addition, local and federal law enforcement officials recovered narcotics and firearms in and around the area where the organization operated.

Some of the organization members identified the organization as "Cruddy Conniving Crutball" or other variations on that name, like "Triple C" or "CCC." The defendants—including Cawthorn, Keishonne Moore, and Creek—controlled the territory through intimidation and violence. Creek, CCC's self-proclaimed leader and founder, supplied many organization members with narcotics. Creek also directed, ordered, and inspired Cawthorn and the younger members to protect the territory through possessing and using firearms. Ultimately, CCC is responsible for at least five homicides and two non-fatal shootings. For example, CCC members targeted and shot two rival drug dealers: Dinkins shot S.J. on April 27, 2018; and Grier shot and killed Vuai Green, a rival drug dealer, on August 18, 2018. Both CCC members have admitted to these shootings—Dinkins through the plea agreement he signed with the government; Grier was found guilty of first degree murder after a state court jury trial..

The anticipated evidence arises from various sources, including the seizure of narcotics and narcotics paraphernalia, physical and electronic surveillance, video surveillance, police reports, laboratory analysis, and numerous witnesses. The evidence supporting the conspiracy count and the individual substantive counts includes evidence of drug and gun seizures on a

number of individual dates during the investigation.  This memorandum will discuss the facts of those particular episodes in the Argument sections addressing the motions pertaining to those incidents.

## ARGUMENT

### I.    CONSOLIDATED RESPONSE TO MOTIONS TO SUPPRESS SEARCHES AND SEIZURES.

The defendants have filed numerous motions to suppress evidence obtained through search warrants, tracking warrants, and warrantless searches.  Tellingly, despite receiving the relevant warrant affidavits and police reports in discovery, there are no specific facts supporting nearly all of these suppression requests.  Furthermore, because Fourth Amendment rights are "personal rights," *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988), the motions to adopt are often not appropriate vehicles for seeking suppression, *cf. United States v. Padilla*, 508 U.S. 77, 81–82 (1993) (explaining that coconspirators lack standing to assert Fourth Amendment violations of other coconspirators).  Notwithstanding the motions' general natures, the Court should deny them because the searches complied with the Fourth Amendment.

#### A.    Legal Standard

##### 1.    Search and Tracking Warrants

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).  Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *see Gates*, 462 U.S.

at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false.").  Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.  But people who provide information while admitting their involvement in a crime "carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search."  *United States v. Harris*, 403 U.S. 573, 583 (1971).

The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority . . . to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant."  *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002).  "Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before her.  *Montieth*, 662 F.3d at 664.

Even where a search warrant is found to be lacking, a court should not suppress the evidence if executing officers relied on the warrant in good faith.  *United States v. Leon*, 468 U.S. 897 (1984).  Under *Leon*, the Court should not suppress evidence obtained through a warrant, even a "subsequently invalidated" warrant, unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  468 U.S. at 922 n. 23.  *Leon* does not apply, however, in four situations, none of which are applicable here: (1) the magistrate judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the magistrate judge acted as a rubber stamp for the officers and so "wholly abandoned" his detached and neutral

"judicial role";  (3) "an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or  (4) "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."  *Id.* at 923 (internal quotation marks omitted).

## 2.   Warrantless Searches and Seizures

A police officer may conduct a brief investigatory stop, known as a *Terry* stop, "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Once such a stop is conducted, the officer may inquire further to verify or dispel the officer's suspicions, and, if the officer reasonably believes that the suspect may be armed and dangerous, the officer may conduct a brief pat-down for weapons.  *See Terry*, 392 U.S. at 23, 30.  The level of suspicion required for a *Terry* stop is "less demanding than that for probable cause" and "considerably less than proof of wrongdoing by a preponderance of the evidence."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989). In evaluating the validity of a *Terry* stop, courts consider "the totality of the circumstances." *Sokolow*, 490 U.S. at 8.  Factors which alone may be "susceptible of innocent explanation" can "form a particularized and objective basis for a stop when taken together."  *United States v. Arvizu*, 534 U.S. 266, 277–78 (2002).  While an officer's "hunch" will not justify a stop, *Terry*, 392 U.S. at 27, courts must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Arvizu*, 534 U.S. at 273*; United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (reviewing courts should "give due weight to common sense judgments reached by officers in light of their experience and training").

Officers conducting a *Terry* stop are authorized to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Even a "complete restriction of liberty is valid," so long as it lasts "no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995). Thus, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *Id.* at 1109–10.

Another well-recognized exception to the warrant requirement is the search incident to an arrest. Where an officer effects a lawful arrest, the officer may, without a warrant, search the arrestee's person and areas or containers within the arrestee's immediate control. *See United States v. Currence*, 446 F.3d 554, 556–57 (4th Cir. 2006).

Vehicles may be searched without a warrant under multiple exceptions to the Fourth Amendment's warrant requirement. First, a search of a vehicle incident to arrest is permissible if (1) an unsecured arrestee is able to reach the interior of the vehicle at the time of the search or (2) officers have reason to believe the vehicle contains evidence of the crime of arrest. *Arizona v. Gant*, 556 U.S. 332, 351 (2009). Second, the automobile exception permits warrantless searches where there is probable cause to believe that a "readily mobile" vehicle contains contraband or evidence of a crime. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Third, an inventory search of a vehicle is a lawful warrantless search "(1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017); *see also Colorado v. Bertine*, 479 U.S. 367, 374 (1987)

8

("reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment").

Even if a vehicle search exceeds its scope, recovered evidence may be admissible pursuant to the "inevitable discovery doctrine." *Nix v. Williams*, 647 U.S. 431, 439 (1984).  Evidence improperly seized is admissible if the government can establish by a preponderance "that the information ultimately or inevitably would have been discovered by lawful means."

**B.    The Arrests and Seizures Challenged in Cawthorn's Motions Were Supported by Probable Cause or Were Otherwise Permissible Under the Fourth Amendment.**

Cawthorn moves to suppress evidence seized under warrants allowing investigators to (1) track his cellphone assigned number (443) 500-7088, ECF No. 342, (2) search his iPhone 7, ECF No. 342, (3) search his iPhone 8, ECF No. 342, (4) arrest him on August 11, 2018, ECF No. 343, and (5) search his house at 3201 Massachusetts Avenue in Baltimore City, ECF No. 342. Specifically, Cawthorn argues generally that these searches and seizures were neither based on probable cause nor carried out in good faith, thus rendering them invalid and all seized evidence inadmissible.[3]  He also argues, without factual support, that the warrants for his cellphones contain intentionally conflicting or false information and that the delay in searching his iPhone 7 was unconstitutional.  These arguments are without merit.

**1.    Investigators Properly Tracked Cawthorn's Cellphone Assigned Number (443) 500-7088 and Searched His iPhone 7.**

---

[3] Cawthorn, without factual support, also requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  To trigger *Franks*, however, the defendant must make a "substantial preliminary showing" that the affiant made (1) a false statement, (2) "knowingly and intentionally, or with reckless disregard for the truth," that was (3) "necessary to the finding of probable cause." *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (citing *Franks*, 438 U.S. at 155–56). The defendant also must offer proof—"affidavits or sworn or otherwise reliable statements of witnesses or explain their absence." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008) (citation and alterations omitted).  Because Cawthorn has not met this substantial burden, he has made no credible claim to trigger a *Franks* hearing.

Cawthorn challenges two warrants issued on August 16, 2018, supported by one affidavit. *See* 18-2245-ADC and 18-2246-ADC, attached as Exhibit 1.  That day, ATF investigators obtained warrants to track Cawthorn's phone number (443) 500-7088 and search Cawthorn's iPhone 7.  The affidavit explained that ATF had been investigating Cawthorn and his co-conspirators' drug trafficking activity since May 2018.  *Id.* ¶ 10.  Investigators had frequently seen Cawthorn interacting with his conspirators within their drug territory.  *Id.* ¶ 13.  They seized his iPhone 7 after seeing one such interaction on August 3, 2018.  That day, after first seeing Cawthorn interact with Harris-Howell on the 1600 block of Normal Avenue, where the drug shop operated, BPD investigators then saw Cawthorn hand co-defendant Bradley a small plastic bag of what appeared to be narcotics.  *Id.*  He counted money and repeatedly looked at his phone while Bradley made hand-to-hand drug sales.  *Id.*  BPD investigators arrested Cawthorn and Bradley, found suspected narcotics on Bradley, and found the iPhone 7 on Cawthorn.  *Id.* ¶¶ 13–15.

The affidavit also explained its basis for tracking one of Cawthorn's phone numbers, (443) 500-7088.  Investigators learned that number after Tunnell gave his own number to an undercover agent in June 2018.  ¶¶ 10–11.  When investigators analyzed Tunnell's toll records, they learned that (443) 500-7088 had called or received calls from Tunnell multiple times over a five-month span.  *Id.* ¶ 11.  A recorded jail call from June 2018 connected that number to Cawthorn, when the caller identified the person using the number by Cawthorn's name ("Correy") and the person using the number gave Cawthorn's address ("3505 Chesterfield") as his own address.  *Id.* ¶ 15.  Cawthorn made a recorded jail call to his mother the day of his arrest in which he said he will get a new phone for his number, and confirms the number as (443) 500-7088.  *Id.* ¶ 3, fn 3.  Moreover, Cawthorn continued to use the number in August 2018 after transferring it to a new device.  *Id.* ¶¶ 15–16.

In addition to these observations, the affiant wrote about his training and experience.  He had been an ATF special agent for about a year, had been a police officer for over six years before joining ATF, and had completed at least two ATF training courses on criminal investigations.  *Id.* ¶ 6.  Through his training and experience, the affiant knew that drug traffickers frequently used cellphones to store records—like other traffickers and suppliers' contact information—and to facilitate the drug transactions by storing co-conspirators' phone numbers, texting co-conspirators, and taking photographs of themselves, their associates, or their proceeds.  *Id.* ¶ 8.

Magistrate Judge A. David Copperthite, who issued the warrants, found probable cause to track one phone and search the other based on an affidavit that established a "fair probability" that evidence of Cawthorn's unlawful activity would be found in the requested information.  *See Montieth*, 662 F.3d at 664.  Specifically, the affidavit set forth facts surrounding the drug trafficking that investigators actually saw Cawthorn engaging in, including instances where he pulled out the iPhone 7 while conducting drug activities.  The affidavit also established the affiant's training and experience supporting the conclusions drawn from these facts.  The facts set forth in the affidavit established probable cause that the subject of the warrants was engaged in drug trafficking, that the requested GPS/tracking/ping information would yield evidentiary information about that criminal activity, and that a forensic search of the iPhone 7 would do the same.  The warrants are facially valid, and the motion should be denied on this basis.

Even assuming that one or both of the seizures were invalid, the exclusionary rule should not apply because the officers acted in good faith reliance on the warrants under *Leon*.  The good faith exception provides that suppressing the fruits of a judicially-authorized warrant, even one subsequently invalidated, should not occur "unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  *Bynum*, 293 F.3d at 195.

Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role . . . ; (3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004).

Here, each of the affidavits Cawthorn challenges above contained ample evidence of probable cause. And the affidavits are not the type of "bare bones" affidavits that courts have previously found lacking in the requisite objectively reasonable information supporting the good faith exception. *See United States v. Doyle*, 650 F.3d 460, 471–73 (4th Cir. 2011); *United States v. Wilhelm*, 80 F.3d 116, 121–22 (4th Cir. 1996). Therefore, even if the Court determines that one or more of the warrants or applications lacked sufficient probable cause, the Court should not preclude the admission of the evidence seized from the execution of the search warrants or applications pursuant to the "good faith" exception.

Finally, the 13-day wait before obtaining a warrant to search the iPhone 7 was reasonable. A seizure that was lawful at its inception "can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). Thus, to determine if a seizure was reasonable, courts balance privacy-related and law enforcement-related interests. *Illinois v. McArthur*, 531 U.S. 326, 331 (2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). This same balancing applies in determining whether an

extended seizure of property violates the Fourth Amendment.  *See United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019) ("To determine if an extended seizure violates the Fourth Amendment, we balance the government's interest in the seizure against the individual's possessory interest in the object seized.").  The "ultimate touchstone of the Fourth Amendment is 'reasonableness,'" not perfection. *United States v. Burton*, 756 F. App'x 295, 300 (4th Cir. 2018) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  And there is no bright line rule that a delay in obtaining a warrant of a particular length is *per se* unreasonable.  Rather, "[t]he reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis." *Thomas v. United States*, 775 F. App'x 477, 489 (11th Cir. 2019) (33-day delay reasonable).

Here, several factors show that the delay was reasonable.  First, during the period of time before the warrant was obtained, Cawthorn never asked for his phone back from law enforcement.  This alone heavily diminished Cawthorn's possessory interests in his phone.  *See United States v. Johns*, 469 U.S. 478, 487 (1985) (noting that defendants who never sought return of the property could not show that delay adversely affected Fourth Amendment rights).  Second, the government's interest in the phone was great.  "The [government] has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion.  All else being equal, the Fourth Amendment will tolerate greater delays after probable-cause seizures." *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012); *accord Burton*, 756 F. App'x at 300.  Here, Cawthorn's phone was seized after he had been arrested and charged with a drug trafficking crime.  Because officers saw Cawthorn actually using the phone while engaging in drug trafficking activity, the officers had ample probable cause to believe that the phone contained evidence of his crimes.

For all of these reasons, the Court should deny Cawthorn's motion as to tracking of one phone number and the search of his iPhone 7.

> **2.    The Searches of Cawthorn's Person, Home at 3201 Massachusetts Avenue, and iPhone 8 were Legal and Supported by Probable Cause.**

Next, Cawthorn challenges a series of searches that arose from a shooting investigation. Members of the Baltimore County Police Department executed a state warrant for Cawthorn's arrest in relation to that investigation on August 11, 2018.  On August 28, 2018, they obtained a state warrant to search his home on Massachusetts Avenue in Baltimore City, attached as Exhibit 2,[4] and, on September 4, 2018, they obtained a warrant to search two iPhones—including the iPhone 8 (the pink and white phone) challenged here—recovered from Cawthorn on the day of his arrest, attached as Exhibit 3.

According to the affidavits, during the early morning of August 11, 2018, BCPD officers responded to a shooting scene and found the victim suffering from a gunshot wound to his upper body.  Ex. 3, at 2.  A dash camera in a truck parked across the street captured the suspect, wearing a black shirt with the word "RAW" written on the front, among a group of people moments before the shooting.  *Id.*  The victim identified the suspect as the person who shot him.  *Id.*  The BCPD officers recognized someone in the suspect's group, reviewed that person's Facebook profile, and saw a picture of Cawthorn wearing the same "RAW" shirt.  *Id.* at 3.  When the victim identified Cawthorn as the shooter by looking at his picture, investigators got a warrant for Cawthorn's arrest. *Id.*  They saw Cawthorn leave his home on Massachusetts Avenue, arrested him, and found the two phones incident to his arrest.  *Id.*

---

[4] The warrant also authorized the search of a gray 2003 Volvo XC90, believed to be operated by Cawthorn on the night of the shooting.  Officers did not seize any property or evidence as a result of the search either property and, accordingly, there is nothing to suppress.

To supplement those observations, the affidavits also discussed the aspects of the affiant's training and experience. The affidavits noted that, based on his training and experience, the affiant knew that people often kept firearms in their homes and that the firearm involved in the August 11 shooting had not yet been found. Ex. 2, at 4. The affidavits also noted that electronic devices, like cellphones, often had evidence of who suspects may have contacted leading up to violent acts, stored electronic communications that would explain motive, showed phone calls, emails, and text messages between co-conspirators, and photographs or videos of the crime. Ex. 3, at 3–4.

Again, the affidavits supporting the Cawthorn's arrest, as well as the searches of his home and phone, established a "fair probability" that evidence of Cawthorn committed the shooting and that evidence of his crime would be found in the requested locations. *See Montieth*, 662 F.3d at 664. Cawthorn's clothing tied him to the incident, and the victim confirmed his participation in the crime. After Cawthorn's arrest, the affiant's training and experience established the requisite information to connect the home and phone to offense. In assessing the totality of the circumstances, it is appropriate to consider an officer's practical experience and the inferences the officer may draw from that experience. *See Ornelas v. United States*, 517 U.S. 690, 700 (1996). The state court judge did so here.

Nevertheless, the officers acted in good faith under *Leon* because they relied on a warrant that outlined ample probable cause that link each relevant target—Cawthorn, his house, and his phone—to the crimes. And, for similar reasons as above, the delay in searching the iPhone 8 was reasonable because Cawthorn never asked for his cellphone back, and the government had a strong interest in the phone, given the affiant's experience with the organization and that they had already seen Cawthorn using a different phone while carrying out drug shop activities.

For those reasons, the Court should deny Cawthorn's challenges to his August 11 arrest, as well as the search of his home and phone that emanated from that arrest.

### 3. The Warrantless Searches on September 4, 2017 and August 3, 2018 Were Constitutional and Supported by Probable Cause.

Cawthorn also moves to suppress evidence seized from: (1) his Volvo on September 4, 2017, ECF No. 454, and (2) his person on August 3, 2018, ECF No. 346.  Cawthorn argues generally that probable cause did not support these searches and seizures.  Notwithstanding the general nature of the motions, the seizures in these incidents were lawful as set forth below, and the Court should deny Cawthorn's motions.

The government anticipates witnesses to testify about the following facts surrounding the warrantless searches.  On September 4, 2017, BPD officers were looking for a silver Volvo SUV with tinted windows as possibly being involved in a shooting when they saw Cawthorn driving a vehicle matching the description of the suspect vehicle.  They observed Cawthorn park his vehicle in the 2300 block of Germania Avenue in Baltimore City.  Cawthorn got out of the car, and, when he noticed the officers, he ran away into a space between two buildings.  When he reemerged several seconds later, the officers ordered him to the ground.  They requested a K-9, who performed a drug sniff and alerted to the presence of drugs at the driver's side door.  They also saw the handle of gun in plain view under the driver's seat.  They opened the door and found a Springfield XD-9 handgun under the seat and a medicine bottle with Cawthorn's name on it in the glove compartment.  They canvassed Cawthorn's flight path and found the keys to Cawthorn's Volvo.[5]

---

[5] The Volvo is actually registered to Vonda Cole, Cawthorn's mother.  To the extent Cawthorn was did not have permission to drive the Volvo, he would lack standing to contest its search.  *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (limiting standing to "one who owns or lawfully possesses or controls property").

Under these circumstances, the search of the Volvo and recovery of the firearm was permissible. First, the search did not result from a stop, as Cawthorn had already parked his car and fled when he saw police approaching. "Where, as here, physical force is absent, a seizure requires both 'a show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Thereafter, the officers permissibly searched the Volvo after seeing the firearm in plain view. In Maryland, transporting an unsecured handgun in a vehicle is generally prohibited. *See* Md. Code Ann., Crim. Law. § 4–203(a)(1)(ii). Armed with probable cause that the Volvo contained evidence of a crime, the officer searched it and seized the firearm under the automobile exception to the warrant requirement. *See United States v. Johnson*, 410, F.3d 137, 143 (4th Cir. 2005) (citing *Dyson*, 527 U.S. at 467).

Similarly, on August 3, 2018, a BPD officer was monitoring a closed circuit camera along the 1500 block of Cliftview Avenue in Baltimore City when he saw Cawthorn hand co-defendant Bradley a clear bag of what appeared to be narcotics, which Bradley put in his waistband. Within minutes, the officer saw Bradley complete hand-to-hand drug transactions with customers by pulling out suspected narcotics from his waistband. The officer communicated what he saw to other officers who, after about 15 minutes, arrived on scene and arrested Bradley. After a brief pursuit, they arrested Cawthorn and recovered his iPhone 7 (the subject of the challenge above).

This search and seizure was lawful, too. In this instance, the officer's observations over the closed circuit camera—watching Cawthorn hand Bradley suspected narcotics, then watching Bradley sell those narcotics to customers—were sufficient for a prudent man to believe that the defendant had committed an offense. *United States v. Dorlouis*, 107 F.3d 248, 255 (4th Cir. 1997). Moreover, the officers who arrested Cawthorn were armed with the collective knowledge of the

officer monitoring the closed circuit camera, sufficient to justify the arrest.  *See United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996).  Therefore, these searches were permissible under the Fourth Amendment, and the motion to suppress should be denied.

### C.   The Seizures Challenged in Creek's Motions Were Supported by Probable Cause or Were Otherwise Permissible Under the Fourth Amendment.

Creek moves to suppress evidence seized under warrants allowing investigators to (1) track his cellphone assigned number (443) 570-7290, ECF No. 398, (2) search five cellphones seized from him after his November 26, 2019 arrest, ECF No. 428, and (3) search his Instagram account, ECF No. 429.  Specifically, Creek argues generally that these searches and seizures were neither based on probable cause nor carried out in good faith, thus rendering them invalid and all seized evidence inadmissible.  He also argues that the delay in searching the five cellphones and Instagram account was unconstitutional under *Pratt*; that investigators did not search the five cellphones within the time authorized by the warrant; and that Instagram search was overbroad because it did not have any temporal limitations.  As explained below, these arguments should fail.

### 1.   Agents Had Probable Cause to Track Creek's Phone Number as Evidence in the Appropriately Authorized Warrant.

ATF investigators obtained a warrant to track Creek's number, (443) 570-7290, on September 5, 2019.  *See* 19-2876-JMC, attached as Exhibit 4.  In the affidavit, the affiant explained that ATF had been investigating CCC since May 2018 and that, in January 2019, a federal grand jury had charged 16 of its members with a drug distribution conspiracy and other related charges.  *Id.* ¶¶ 7–8.  Despite the indictment, ATF was continuing to investigate unindicted co-conspirators, including Creek.  *Id.* ¶ 9.  Multiple confidential sources—including former CCC members and who knew Creek personally—told investigators that Creek was actively running or supplying drug shops around Baltimore.  *Id.* ¶¶ 10–13.  They identified Creek's drug territory and CCC's stash

locations. *Id.* Investigators found Creek's Instagram profile and saw that he declared himself the "CEO and founder" of CCC. *Id.* ¶ 10. And they described recorded jail calls where third parties identified Creek's drug shop locations. *Id.* ¶ 14. In April 2019, BPD gave ATF Creek's number. *Id.* ¶ 16. Investigators listened to jail calls recorded in June and July 2019 in which an inmate called Creek at this phone number; over the calls, investigators believed that Creek discussed supplying marijuana to another person, buying or distributing firearms, and CCC's ongoing activities. *Id.* ¶¶ 18–19.

In addition to this information, the affiant also described why, based on his training and experience, a drug trafficker's location information would prove fruitful. The affiant explained that drug traffickers often stored drugs and proceeds in multiple locations, and—to the extent that a drug trafficker carried a cellphone—service providers would be able to provide the approximate locations of those places. *Id.* ¶¶ 4, 28.

Under these circumstances, the affidavit supporting the tracking warrant established a "fair probability" that evidence of Creek's unlawful activity would be found in the requested records and information. *See Montieth*, 662 F.3d at 664. Specifically, the affidavit set summarized the information from confidential sources regarding Creek's role in the organization, as well as Creek's own assertions that he founded and led the drug shop. The affidavit also cited specific incidents where Creek used the phone number to carry out his drug trafficking activities, and it established the affiant's training and experience supporting the conclusions drawn from these facts. Finally, the affidavit established probable cause that the requested GPS/tracking/ping information would yield evidentiary information about that criminal activity. This warrant, too, is facially valid, and the motion should be denied on this basis.

19

Even still, the officers acted in good faith under *Leon* because they relied on a warrant that outlined ample probable cause that linked Creek and his specific phone number to drug trafficking activity.

> **2.     The Warrant Executed on Creek's Five Cellphones was Supported by Probable Cause.**

Creek's challenge of the forensic searches of his phones should also fail.  On December 13, 2019, ATF investigators obtained a warrant to search five of Creek's phones.  *See* 19-4069-BPG, attached as Exhibit 5.  This was among the more detailed affidavits that focused on Creek. Like other affidavits, the affiant explained that ATF had been investigating CCC since May 2018 and that, in January 2019, a federal grand jury had charged 16 of its members with a drug distribution conspiracy and other related charges.  *Id.* ¶¶ 8–9.  Despite the indictment, ATF was continuing to investigate unindicted co-conspirators, including Creek.  *Id.* ¶ 10.  Like other affidavits, multiple confidential sources—including former CCC members and who knew Creek personally—told investigators that Creek was actively running or supplying drug shops around Baltimore.  *Id.* ¶¶ 11–14.  They identified Creek's drug territory and CCC's stash locations.  *Id.*

This affidavit, however, went much farther.  The affiant described that local investigators executed a state search warrant at Creek's house on Homestead Avenue in Baltimore City.  *Id.* ¶ 15.  Although Creek was not home, local investigators found a firearm, bandanas with CCC's logo, and some drugs and drug packaging materials.  *Id.*  The affiant then described a jail call from July 2019 during which investigators believe that Creek discussed CCC affairs, like placing a specific person in a supervisory role and the percentage Creek collected from others' drugs sales within his drug territory.  *Id.* ¶¶ 18–19.  The affiant described executing federal search warrants on CCC members' cellphones, including those charged in this case.  *Id.* ¶ 20.  The members listed

Creek as a contact and exchanged text messages, photos, and videos with him, including multiple conversations in October 2018 and June 2019 about trading or obtaining firearms.  *Id.*

ATF investigators got an arrest warrant for Creek and, on November 26, 2019, they arrested him and seized his five cellphones.  *Id.* ¶ 22.  After his arrest, Creek's daughter continued to post on Creek's Instagram account.  Investigators believe that she warned Creek's associates not to call his seized cellphones and that she posted a photo of Creek during his initial appearance in this Court.  *Id.* ¶¶ 22 & n.7.

Here, the affidavits established Creek's link to the drug trafficking activity, as well as the connection between the phones and the crimes.  Specifically, courts have acknowledged that a cellphone is "a recognized tool of the trade in drug dealing," *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992), and that an affiant's knowledge, training, and experience of drug dealers' use of cellphones in the trade can support a finding of probable cause, *see United States v. Gibbs*, 547 F. App'x 174, 179 (4th Cir. 2013) (holding that a search warrant authorizing GPS monitoring of a cell phone was supported by probable cause where the affidavit recounted the user's "extensive drug dealing activities").

Again, *Leon* should cure any defect in the warrants because the affidavits outlined more than sufficient probable cause based on the observations, source information, and affiant's experience.  And the delay in obtaining the warrant (17 days) was not unreasonable because Creek did not ask law enforcement to return his phones, the government had a strong basis to conclude that the phones contained evidence of a crime, and the delay was relatively brief.  As such, the Court should deny Creek's challenges to these searches.

### 3.   The Warrant Authorizing the Search of Creek's Instagram Account Had Substantial Probable Cause.

Finally, Creek challenges the warrant authorizing investigators to search his Instagram account.  On August 2, 2019, ATF investigators obtained a warrant to search 28 social media accounts, among them Creek's Instagram account ("hov_a_realnigga").  *See* 19-2557-SAG, attached as Exhibit 6.  The affidavit contained a lot of the same investigatory background information as the other affidavits.  *See id.* ¶¶ 46–47.  It then explained that investigators looked at YouTube videos featuring CCC members, including Creek.  *Id.* ¶ 48.  In the videos, CCC members pointed what appeared to be firearms at the camera, simulated trigger pulling movements, and rapped about what investigators perceived as shootings.  *Id.*  On his Instagram account, Bradley had linked to one of the videos featuring Creek and other CCC members.  *Id.* ¶ 51.  For Creek specifically, the affiant explained that they identified his account because it used his photo as the profile picture and the profile name used his nickname ("hov"), which investigators learned through a confidential source.  *Id.* ¶ 59.  Creek had purported himself to be a founding member of CCC and, on his most recent Instagram post before investigators obtained the warrant, Creek had posted about CCC, writing the hashtag #triple_c_movement."  *Id.*  The affidavit described multiple posts where Creek's Instagram account referenced CCC activity.  For example, the biography described Creek as CCC's "CEO and founder," Creek made a post about one of his arrests in March 2019, and there were several posts about CCC, jewelry, money, and marijuana. *Id.* ¶ 60.  Undercover agents had bought marijuana from CCC members in CCC territory during the investigation.  *Id.*

The affiant also described, based on her training and experience, the ways drug traffickers generally used social media—namely, that drug traffickers and people who commit violent acts used platforms like Instagram to further their illegal activity by communicating with conspirators,

sharing photos and videos with each other, advertising drug sales, spreading news about murders and shootings, and intimidating rivals. *Id.* ¶ 44.  Based on that training and experience, the affiant explained that she knew that social media accounts belonging to drug traffickers and people who commit violent acts were likely to contain evidence of their crimes—such as photographs with and messages between conspirators—sometimes wearing gang clothing, sometimes holding firearms and drugs. *Id.* ¶ 45.  Moreover, Instagram collected its users' location information. *Id.*  Because, in her training and experience, people installed social media apps on their cellphones and carried their cellphones with them virtually everywhere, the affiant believed that the social media accounts of drug traffickers and people who commit violent acts could be used to find evidence of their whereabouts. *Id.*

Here, like all the prior warrants, the affidavit contained substantial information about Creek's connection to the criminal activity, his connection to his Instagram account, the actual instances where his Instagram activity directly referenced his involvement in the conspiracy, and the connections that could be drawn from the affiant's training and experience.  Thus, it contained ample probable cause and more than a sufficient basis to cure any deficiency under *Leon*.

While Creek argues, without basis, that the search was not limited by temporal scope, a cursory review of the affidavit confirms that the allegation is wrong.  The application limited its request to anything after January 1, 2017.  This was a reasonable scope given the other activity described included in the affidavit.  For example, the affidavit described posts from early 2017 where CCC members uploaded photos showing their association with each other, referenced CCC, or discussed making money with other conspirators.  *See* ¶¶ 49, 57.  Because Creek purportedly founded the group, the magistrate judge could reasonably infer that Creek's account would contain evidence of their conspiracy during the same span.

Likewise, Creek's argument about the veracity statement should also fail.  For one thing, the affidavit contained some of the confidential source's veracity information, explaining that the source was a former CCC member and was being paid for his/her information.  For another thing, the affiant corroborated much of the source's information, boosting the source's veracity in that regard.  *See Gates*, 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work.").  The source said that Creek's nickname is "Hov," that he sold drugs, and that he supplied drugs to CCC.  All of that information was corroborated by independent sources before investigators sought the warrant.  Even then, the other information in the affidavit—like Creek's self-proclamations that he founded the organization, also provided sufficient probable cause under the totality of information available to the magistrate judge.

Finally, any attempt to suppress the social media returns under *Pratt* should fail, as the constitutional concerns underpinning *Pratt* are non-existent for social media accounts.  *Pratt* centered on instances where the delay in obtaining a warrant "infringes" on the defendant's "possessory interests" in the object being searched.  *See* 915 F.3d at 271.  As such, *Pratt* applies only to tangible objects, like phones or computers, where the government's seizure of the object itself interferes with its owner's ability maintain control.  *See id.* at 272–73 ("Pratt had an undiminished possessory interest in the cellphone—he didn't consent to the seizure and he wasn't allowed to retain any of the phone's files.").  Social media accounts are inherently different because multiple people can access the data at the same time, and the defendant can still freely access his data even while and after the government has seized it.  Thus, no delay can affect Creek's possessory interest in a way that runs afoul of *Pratt*.  Indeed, to date, no court has extended *Pratt* to non-tangible objects.

For all these reasons, the Court should deny Creek's motions.

**D.      Officers had Probable Cause to Arrest Harris-Howell Without A Warrant and Property Seized from Harris-Howell Was Proper As it Resulted from a Search Incident to Arrest.**

Harris-Howell moves to suppress evidence seized after his warrantless arrest on August 20, 2018, ECF No. 450, arguing, without explanation, that investigators lacked reasonable articulable suspicion to stop him, lacked reasonable articulable suspicion to believe that he was armed and dangerous, and extended the length of his detention beyond its permissible scope.  He is wrong.

The government expects to present testimony of the following.  On August 20, 2018, a BPD officer was conducting covert surveillance through the closed circuit camera in the 1600 block of Normal Avenue in Baltimore City.  The officer saw Harris-Howell on the block with small container sticking out of his pocket.  Harris-Howell handed another person small objects from the container in exchange for money.  Soon afterward, the officer saw Harris-Howell walk to a gold Honda, grab an unknown object from inside the car, and put it in his waistband.  A co-defendant (Demory) helped Harris-Howell adjust the object in his waistband.

Believing the object was a firearm, the officer communicated what he saw to other officers. When Harris-Howell saw marked police cars arrive, he fled, briefly stumbled on the ground, fumbled with the object in his waistband, and ran into a vacant house at 1628 Normal Avenue. Officers canvassed the immediate area, particularly where Harris-Howell stumbled, and found magazine parts and dozens of rounds of ammunition (the officers believed that Harris-Howell had broken an extended magazine).  Additional officers arrived, entered 1628 Normal Avenue, took Harris-Howell into custody, and recovered his cellphone.  Inside a vent in the room where they found Harris-Howell, officer also found 12 blue ziplock bags with suspected crack cocaine.

By the time officers arrested Harris-Howell, they had developed abundant probable cause.[6] First, they saw Harris-Howell engage in what appeared to be a drug transaction before heading to the car and putting a different object in his waistband.  That alone gave the officers probable cause. *See United States v. Flinches*, 327 F.3d 582, 586–87 (7th Cir.2003) (explaining that, without observing the presence of drugs, the agents had probable cause to believe the exchange of shopping bags in alley was a drug transaction where agents with extensive experience could recognize actions as common characteristics of a drug transaction).  The officers saw the ammunition and magazine parts scattered around the area where Harris-Howell stumbled and fumbled around with the object in his waistband.  This provided additional basis to believe that he was engaged in criminal activity because it is generally illegal to carry a firearm in public, even concealed, in public.  *See* Md. Code Ann., Crim. Law § 4–203(a)(1)(i).

Harris-Howell's unprovoked flight and the movements toward his waistband only boosted the likelihood that criminal activity was afoot.  *See Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *see also United States v. Foster*, 824 F.3d 84, 94 (4th Cir. 2016) ("A security check by a suspect can contribute to a finding of reasonable suspicion that the suspect was engaged in criminal activity.").  Based on those circumstances, Harris-Howell's motion lacks merit.

### E.   Keishonne Moore's Searches and Arrest were Supported by Probable Cause.

Keishonne Moore moves to suppress evidence seized (1) under a warrant authorizing investigators to search his cellphone, ECF No. 377, and (2) after his warrantless arrest on

---

[6] Importantly, Harris-Howell was not detained or seized until his arrest inside the vacant home because he did not submit to the officers' authority.  *See Hodari D.*, 499 U.S. at 626.

December 4, 2018, ECF No. 378.  Specifically, Keishonne Moore argues, without articulating why, that both searches lacked probable cause.  He also argues, without reason, that investigators lacked reasonable articulable suspicion to stop him.  This, too, is without merit and can be quickly addressed under the same legal principles applicable to his co-defendant's motions.

### 1.   Probable Cause Supported the Federal Warrant Authorizing the Search of Keishonne Moore's Phone.

Keishonne Moore first challenges the warrant authorizing investigators to search the cellphone they recovered while arresting him for the federal offense.  ATF investigators obtained the warrant on February 22, 2019.  *See* 19-678-SAG, attached as Exhibit 7.  The affidavit, much like the others in this case, explained that ATF had been investigating the organization since May 2018 and that, through controlled purchases, they had recovered about 83 grams of crack cocaine and 50 grams of marijuana; they also recovered or seized three firearms.  *Id.* ¶ 10.  Investigators also learned a lot about the organization through BPD arrests of the organization's members and the authorized searches of their cellphones.  *Id.*  Investigators also saw members engaging in drug trafficking activities via a pole camera installed in their drug territory.  *Id.*  From these observations, the affidavit explained, a federal grand jury returned an indictment charging several of the members—including Keishonne Moore—with federal offenses, and investigators got warrants for their arrest.  *Id.* & n.2.

The affidavit also included specific information about Keishonne Moore.  It described an incident on October 22, 2018, where Keishonne Moore participated in the sale of suspected cocaine to an undercover agent.  *See id.* ¶ 17.  It also described an incident on December 4, 2018, when BPD officers found several loose pieces of suspected crack cocaine in the front pocket of Keishonne Moore's hoodie.  *See id.* ¶ 18.  In a subsequent search, investigators found over

140 additional small containers of suspected crack cocaine.  *Id.*  On January 29, 2019, arrested

Keishonne Moore under the federal warrant and recovered his cellphone.  *Id.* ¶ 19.

Finally, much like the affiants in the previous warrants, the affiant here recounted his

training and experience, including his knowledge that drug traffickers frequently used cellphones

to facilitate drug distribution and to communicate with each other.  *Id.* ¶ 6.  Their cellphones also

stored conspirator contacts and messages, photographs and videos of drugs and drug proceeds, and

to keep track of their transactions.  *Id.*  Moreover, the affiant culled from his own knowledge of

how this specific drug shop operated—recalling that 16 of the 11 defendants had appeared in

previously recovered phones and were in regular contact with each other, supporting that they

actually used their phones to coordinate with suppliers, customers, and each other.  *Id.* ¶ 20.

And much like the other warrants, the affidavit contained substantial information about

Keishonne Moore's connection to the criminal activity, his connection to cellphone, and the

connections that could be drawn from the affiant's training and experience.  Thus, it contained

abundant probable cause and more than a sufficient basis to cure any deficiency under *Leon*.

> **2.      Baltimore City Officers had Probable Cause to Arrest Keishonne Moore on December 4, 2018, and the Seizure of Any Property was Constitutional.**

Keishonne Moore claims that law enforcement lacked probable cause to arrest him the

night he and co-defendant Desean Johnson were stopped in a vehicle.  But the government expects

to offer the following testimony to support the warrantless arrest.  On December 4, 2018, a BPD

officer saw a red Lexus with South Carolina temporary tags traveling along North Wolfe Street in

Baltimore City.  The officer initiated a traffic stop after the driver turned on his hazard lights while

driving through an intersection.  The driver, Johnson, gave the officer a false identification and

registration, and the officer believes that Johnson was trying to conceal something because he was

hunched over the in front seat.  Keishonne Moore and a third person were also in the car.  When the officer asked Johnson to get out of the car, Johnson stepped out and tried to curl up on the ground.  The officer did a pat down search and felt a hard object in Johnson's pants, which turned out to be a firearm.  At that point, the officers directed everyone out of the car.  As Keishonne Moore got out of the car, they saw several small, loose containers of what appeared to be crack cocaine in plain view in his front hoodie pocket.  They searched him and found over 140 more small containers of suspected crack cocaine and about $436 in cash in Keishonne Moore's pants.

Every aspect of this stop was permissible.  The officer initiated a traffic stop after watching the Lexus drive through the intersection with its hazard lights on.  In Maryland, it is unlawful to drive with the hazard lights activated.  *See* Md. Code Ann., Transp. § 22–227(e).  The officers asked Keishonne Moore to get out of the car only after they found that the driver did in fact have a firearm.  Nevertheless, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).  From there, the officers saw suspected narcotics in plain view on Keishonne Moore's person, giving them probable cause to arrest, and permission to search him incident to the arrest.  The Court should deny Keishonne Moore's request to suppress the evidence.

## II.   CONSOLIDATED RESPONSE TO MOTIONS TO SUPPRESS STATEMENTS.

Tunnell, Cawthorn, Grier, and Harris-Howell move to suppress their various statements to law enforcement.  ECF Nos. 332, 344, 388, and 453.  Notwithstanding their failure to identify with particularly any statements they believe are inadmissible, the government does not believe any statements made to law enforcement were coerced, involuntary, or otherwise inadmissible.  For the reasons stated below, the Court should deny their motions.

A.      **Legal Standard**

The Fifth Amendment prohibits compelled self-incrimination.  U.S. Const. amend. V.

Members of law enforcement must inform individuals who are in custody of their Fifth

Amendment rights prior to interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Any

individual in police custody and subject to custodial interrogation "must be warned that he has a

right to remain silent, that any statement he does make may be used as evidence against him, and

that he has a right to the presence of an attorney, either retained or appointed."  *Berkemer v.*

*McCarty*, 468 U.S. 420, 429 (1984) (quoting *Miranda*, 384 U.S. at 444).  Officers may issue

*Miranda* warnings orally or in writing.  *See, e.g.*, *United States v. Abdi Wali Dire*, 680 F.3d 446,

474 (4th Cir. 2012) (upholding oral warnings).  An individual is "in custody" for *Miranda* purposes

when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree

associated with formal arrest."  *Berkemer*, 468 U.S. at 440.  "Interrogation" for *Miranda* purposes

means "words or actions on the part of the police . . . that the police should know are reasonably

likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291,

301 (1980).

In addition to complying with *Miranda*, an individual's statements also must be provided

voluntarily.  The applicable test for evaluating the voluntariness of a statement or confession is

whether, given the totality of the circumstances, the will of the speaker was "overborne and his

capacity for self-determination critically impaired."  *United States v. Gray*, 137 F.3d 765, 771 (4th

Cir. 1998) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)); *see also Mincey v.*

*Arizona*, 437 U.S. 385, 399 (1978); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).  In making

this determination, "coercive police activity is a necessary predicate" to any finding that a

confession was not "voluntary" within the meaning of the Due Process Clause of the Constitution. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

In applying these general principles to various factual scenarios, the Fourth Circuit has considered, among other things, factors such as: (1) whether law enforcement officers properly advised the suspect of his right not to make any statements and of his right to have an attorney present; (2) whether the officers inappropriately told the suspect that he was legally obligated to speak with them; (3) whether the officers physically or verbally threatened the suspect; (4) whether the suspect appeared to be cooperative; (5) whether the suspect was misled by the officers into believing that his statements could not be used against him; and (6) whether the officers engaged in any violent behavior during their questioning. *See United States v. Braxton*, 112 F.3d 777, 781–85 (4th Cir. 1997); *Gray*, 137 F.3d at 771.

Accordingly, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment." *Innis*, 446 U.S. at 299-300; *see also Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will."). Thus, unprompted, spontaneous, and otherwise voluntary statements are not prohibited by *Miranda* and are thus admissible. *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993) ("[S]pontaneous statements [that are] not the product of interrogation [are] not barred by the Fifth Amendment."); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir. 1989) (holding that officer's statement in response to

conversation initiated by the defendant should not be construed as attempt to solicit information). The government bears the burden of proving voluntariness or spontaneity by a preponderance of the evidence.  *See, e.g.*, *Braxton*, 112 F.3d at 781.

     **B.**    **Tunnell's Statements to Law Enforcement were Voluntarily Made Following the Proper Administration of *Miranda* Warnings.**

     Tunnel contends that oral statements taken from him were obtained improperly during his arrest by federal agents on January 29, 2019.  Specifically, he asserts that the statements were not made voluntarily because he and the agents lacked a "common understanding"; because he was induced to make statements in exchange for leniency; because he was not asked if he understood each right individually and thus were made without proper waiver; and because they were made without counsel after he requested one.  ECF No. 332.  Tunnell's motion should be denied because none of his statements were improperly obtained.

     Tunnell made recorded post-*Miranda* statements to law enforcement after his arrest in this case.  *See* Tunnell's Recorded Statement, attached as Exhibit 8.  Key to the challenge here, following his lawful arrest, Tunnell was transported to the ATF Baltimore Field Office and Special Agent Sean Sullivan advised Tunnell of his *Miranda* rights.  Agent Sullivan used a written *Miranda* form in doing so, and Tunnell signed a waiver form in the agent's presence.  *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (a statement following a *Miranda* advisement will "rare[ly] be deemed involuntary").  At no time before questioning did Tunnell request counsel or invoke his right to silence or his right to have counsel.  At no time before questioning did Tunnell express or exhibit behavior consistent with being unable to understand the agents; similarly, at no time did Tunnell express or imply that he did not understand the agent's vocabulary or meaning when the agent read Tunnell's *Miranda* rights.  On the contrary, Tunnell's signature on the form reflected his voluntary decision to waive his rights and talk to investigators.

After waiving his *Miranda* rights, Tunnell admitted to selling drugs but denied any involvement in a conspiracy, telling Special Agent Sullivan and Special Agent Lindsay Erbe that he sold drugs in Darley Park on his own, not with any others.  Tunnell stated that he sold drugs for his own benefit and did not work with any others who may have also sold in the block at the same time.  After that, Tunnell provided no further information.  Throughout his interview, Tunnell was cooperative and voluntarily responded to questions from the agents.  The agents neither physically nor verbally threatened Tunnell, and they did not engage in any violent, aggressive, or intimating behavior during questioning.  *Cf. Braxton*, 112 F.3d at 781–85.  The interview stopped promptly when Tunnell ceased providing further information.  Prior to this cessation, Tunnell made no "unambiguous[] and unequivocal[]" request for assistance of counsel.  *United States v. Pettiford*, 295 F. Supp. 2d 552, 562–63 (D. Md. 2003).  Because Tunnell's arrest was lawful and his statements were made post-*Miranda*, the statements were voluntary and should not be suppressed.

### C.    Cawthorn's Statements to Law Enforcement were Also Voluntarily Made Following Proper *Miranda* Warnings.

Cawthorn contends statements taken from him on August 3, 2018, and August 28, 2018, were obtained improperly.  Specifically, he asserts that the statements were obtained after an illegal arrest and in violation of *Miranda*, his Fifth Amendment privilege against compelled or coerced self-incrimination, and his Sixth Amendment right to counsel.  ECF No. 344.  The Court should deny the motion because Cawthorn's statements were also made voluntarily and in compliance with *Miranda*.

The government is aware of two statements that Cawthorn made to law enforcement officers and that are relevant to the facts of this case.  The first statement took place on August 3, 2018, and the second statement occurred on August 28, 2018.

33

As for the August 3, 2018 statement, the government will establish the following: On August 3, 2018, law enforcement observed the area of Harford Road and Cliftview Avenue using a closed captioned camera.  A BPD officer saw Cawthorn hand co-defendant Bradley a clear bag with small items, consistent with street-level narcotics.  Bradley placed the bag inside his waistband and conducted several hand-to-hand narcotics transactions, taking items from his waistband and handing them to individuals in exchange for money.  The officer notified an arrest team who stopped and searched Bradley.  They recovered, among other things, a clear plastic bag with seven vials of cocaine, nine ziplock bags of marijuana, and $33.  Officers also stopped and arrested Cawthorn, who did not have any contraband on his person.  Both Bradley and Cawthorn were arrested for possession with intent to distribute narcotics and other violations pursuant to the observations made by the officers.

Following his lawful arrest, Cawthorn was transported to the Baltimore Police Homicide unit, and Homicide Det. Hunter advised Cawthorn of his *Miranda* rights.  Det. Hunter used a written *Miranda* form in doing so, and Cawthorn read aloud and initialed a waiver form in the detective's presence. *See Dickerson*, 530 U.S. at 444 (a statement following a *Miranda* advisement will "rare[ly] be deemed involuntary").  At no time before questioning did Cawthorn request counsel or invoke his right to silence.  On the contrary, his signature on the form reflected his voluntary decision to waive his rights and talk to the police.

After waiving his *Miranda* rights, Cawthorn then advised the detectives that he was not participating in any illegal activities prior to his arrest.  The detectives questioned Cawthorn regarding "CCC" and several alleged members including, "Hov, Desean, and Karon."  Cawthorn denied knowing anything about "CCC" or specific members.  Ultimately, Cawthorn denied participating in narcotics trafficking, and he denied knowing about any violence in the Darley Park

area.  Cawthorn did admit to being previously shot in the area, but once again, denied knowing who shot him or why he was shot.  Although he appeared interested in the facts and fate of his co-defendant Bradley, Cawthorn did not admit to providing narcotics to Bradley for sale to others.  Finally, after less than an hour, the detectives ended the interrogation, none the wiser to Cawthorn's involvement in and knowledge of criminal activities.

The interview was video and audio recorded.  Throughout his interview, Cawthorn was cooperative and voluntarily responded to the detectives' questions.  *See* Cawthorn's Recorded Statement 1, attached as Exhibit 9.  The officers neither physically nor verbally threatened Cawthorn, nor did they engage in any violent, aggressive, or intimidating behavior during questioning.  *Cf. Braxton*, 112 F.3d at 781–85.  The interview stopped promptly when Cawthorn ceased providing further information.  Prior to this cessation, there was no "unambiguous[] and unequivocal[]" request for assistance of counsel.  *Pettiford*, 295 F. Supp. 2d at 562–63.  Because Cawthorn's arrest was lawful and his statements were made post-*Miranda*, the statements were voluntary and should not be suppressed.

Similarly, the government will establish the facts surrounding the August 28, 2018 statement.  Baltimore County detectives arrested Cawthorn in connection to a non-fatal shooting that occurred on August 11, 2018 during a house party.  Cawthorn fired into a group of individuals and hit an attendee.  Cawthorn and others were caught on video leaving the party after allegedly being denied access to the party.  The video depicts a man of Cawthorn's height and weight wearing a distinctive shirt fire a weapon into the crowd.  Cawthorn posted a photograph of himself in the same shirt on social media, linking him to the crime.

Less than one month after his arrest for drugs in Baltimore City, Cawthorn was arrested for attempted first degree murder and brought to Baltimore County police station.  Two shooting

detectives met with Cawthorn to discuss the events on August 11, 2018, which was recorded.  *See* Cawthorn's Recorded Statement 2, attached as Exhibit 10.  Preliminarily, Detective Schaff read Cawthorn his rights pursuant to *Miranda* from a standard form.  Cawthorn voluntarily signed the form after listening to his rights.  He did not ask any questions or voice any concerns about his ability to understand his rights.

Ultimately, Cawthorn admitted to being at the party but denied that he shot anyone.  As he was less than a month before with Baltimore City detectives, Cawthorn was cooperative, and he voluntarily responded to questions from detectives during this interview.  The detectives neither physically nor verbally threatened Cawthorn, nor did they engage in any violent, aggressive, or intimidating behavior during questioning.  *Cf. Braxton*, 112 F.3d at 781–85.  The interview stopped promptly when Cawthorn ceased providing further information.  Prior to this cessation, he did not "unambiguously and unequivocally" request counsel.  *Pettiford*, 295 F. Supp. 2d at 562–63.  Because Cawthorn's arrest was lawful and his statements were made post-*Miranda*, the statements were voluntary and should not be suppressed.

### D.     Grier's Statements Were Also Voluntarily Made Consistent with *Miranda*.

Grier contends that unspecified statements made to law enforcement were the product of coercive law enforcement behavior and therefore obtained in violation of the Fifth and Sixth Amendments, and his rights pursuant to *Miranda,* without providing details as to why any statements were obtained in violation of these rights.  ECF No. 388.

The government is aware of two statements made by Grier, one on August 21, 2018, and a second one made on February 13, 2019.  Both statements were recorded at the BPD homicide unit.[7]

---

[7] Grier made a recorded statement as a witness to the non-fatal shooting by co-defendant Dinkins

BPD arrested Grier for shooting Vuai Green in the head approximately seven times, killing him instantly.  The shooting occurred on August 18, 2018, at 2 p.m. in the 2300 block of Harford Road in Baltimore City.  Grier is seen on a closed circuit camera running up to Green with several suspected CCC members, including co-defendant McCrorey.  The camera then pans away, and when it returns to Harford Road, Green is laying on the ground and Grier is sprinting away.  Law enforcement believes that Green was a rival drug dealer—Green had a loaded firearm and cocaine on his person—and that motivated Grier to shoot him.  Grier implied that as much in a letter he sent from a city detention center to a friend after his arrest for Green's murder.

BPD executed Grier's arrest warrant on August 21, 2018, after two witnesses identified Grier from the video.  Officers transported Grier to BPD homicide unit where Grier met with Detectives Miller and Niedermeir.  Detective Miller read Grier his *Miranda* rights from a form, which Grier voluntarily signed, waiving his rights and agreeing to speak to the detectives.  Grier did not ask any questions or hesitate to sign the form.  Moreover, he was conversational and appropriately answered questions put to him by the detectives.  Grier acknowledged that he was on camera with several associates, but denied shooting Green in the head.  The detectives moved Grier from one interview room to another to show him the video.  Grier watched the video with the detectives and pointed himself out, but continued to deny shooting Green.  *See* Grier's Recorded Statement, attached as Exhibit 11.

Grier's statements to law enforcement were voluntarily made following the proper administration of *Miranda* warnings.  The detectives do not intimidate Grier into making a statement.  They do not engage in acts rendering Grier's will overborn or render his "capacity for

---

on April 28, 2018.  Grier is not a suspect in the shooting, and therefore *Miranda* does not apply and is not subject to suppression.

self- determination critically impaired." *United States v. Pelton,* 835 F.2d 1067, 1071–72 (4th Cir. 1987). Rather, Grier made a calculated decision to speak with law enforcement officers concerning his presence at the scene of the homicide and on video. His request to suppress this statement should be denied.

On February 13, 2019, Grier was brought to BPD to administer a handwriting sample. Detective Niedermier did not advise Grier of his rights pursuant to *Miranda,* but he did not ask Grier any questions. Rather, the detective placed Grier in an interview room by himself until his state defense counsel arrived. Grier spoke briefly to his defense attorney prior to providing a handwriting sample pursuant to the detective's request, and in the presence of Grier's counsel. The detective and counsel periodically left Grier alone in the interview room, at which time Grier either performed numerous push-ups or wondered out loud who wrote letters alleged to be in Grier's handwriting. Accordingly, the Government does not, at this time, intend to present any of Grier's statements from this encounter.[8]

### E.   Like His Co-Defendants, Harris-Howell's Statements to Law Enforcement Were Voluntarily Made Following the Proper Administration of *Miranda* Warnings After his Lawful Arrest.

Harris-Howell contends that unspecified statements made to law enforcement were the product of coercive law enforcement behavior and therefore obtained in violation of the Fifth and Sixth Amendments, and his rights pursuant to *Miranda,* without providing details as to why any statements were obtained in violation of these rights. ECF No. 449.

The government is aware of two statements that Harris-Howell made to law enforcement officers and that are relevant to the facts of this case. The first statement took place on August 20,

---

[8] The Government shall immediately notify defense counsel and the Court if, in the course of preparing for trial, the statement becomes necessary to present as evidence.

2018, and the second statement occurred on March 22, 2019.  Harris-Howell made both statements after being advised of his rights pursuant to *Miranda;* in addition, both statements were voluntarily and absent of coercion, threats or promises.  Accordingly, the motion to suppress Harris-Howell's statements should be denied.

At the hearing, the government shall present evidence of Harris-Howell's lawful arrest on August 20, 2018, for narcotics and firearm possession.  On that date, law enforcement officers observed the 1600 block of Normal Avenue through a pole-mounted camera.  They saw Harris-Howell conduct a suspected hand-to-hand transaction with an unknown male.  In sum, Harris-Howell removed a rectangular container from his pocket and handed the unknown male a small objects consistent with the shape and size of street-level narcotics in exchange for money.  Law enforcement continued to watch Harris-Howell as he met up with co-defendant Demory.  The men walked to the side of a Honda parked in the block, and Harris-Howell retrieved an unknown object from the driver's compartment.  He placed it in his front waistband of his pants.  Demory adjusted the object in Harris-Howell's pants; in addition, Harris-Howell tied a black sweatshirt over his waistband.  Law enforcement believed Harris-Howell had a firearm in his waistband based on the location of the object and the secretive nature both Demory and Harris-Howell displayed in placing the object.

Patrol units responded to the area to investigate further, but Harris-Howell saw the officers and fled.  Officers saw Harris-Howell stumble as he ran away, touching the ground and leaving several objects on the ground where he fell.  Harris-Howell then ran into 1628 Normal Avenue, which law enforcement knew from the investigation, was a vacant house used to stash illegal contraband.  Some of the officers returned to the area where Harris-Howell stumbled and found

25 rounds of ammunition and pieces of a firearm magazine on the ground, thereby confirming the officers' previous observations that Harris-Howell had a gun in his waistband.

Officers arrested Harris-Howell inside 1628 Normal Avenue.  They recovered 12 blue ziplock bags with cocaine in his pocket.  The ziplocks were inside a rectangular tin similar to what the officers observed through the pole-mounted camera and the hand-to-hand.

Harris-Howell was transported to BPD Eastern District police station.  Det. Faller orally provided Harris-Howell with his rights pursuant *Miranda.*  The interview was not recorded as the station was not equipped to do so at the time.  But Det. Faller will testify that Harris-Howell appeared to understand his rights and voluntarily agreed to waive them.  Det. Faller will state that Harris-Howell admitted to possessing an extended, fully loaded magazine that Harris-Howell bought for $100.  In addition, Harris-Howell admitted to running from the police because he feared that officers saw him buy it.

Throughout his interview, Harris-Howell was cooperative and voluntarily responded to questions from Det. Faller in a clear and appropriate manner.  The detective neither physically nor verbally threatened Harris-Howell, nor did he engage in any violent behavior during questioning. *Cf. Braxton*, 112 F.3d at 781–85.  The interview stopped promptly when Harris-Howell ceased providing further information.   Prior to this cessation, there was no "unambiguous[] and unequivocal[]" request for assistance of counsel.  *Pettiford*, 295 F. Supp. 2d at 562–63.

Harris-Howell claims he was under the influence of narcotics at the time of this statement, thereby rendering it involuntary.  But Harris-Howell fails to offer any evidence of such.  Moreover, a condition precedent to a finding of involuntariness is coercive *government* conduct, whereas here, Harris-Howell argues that his own actions rendered his statements involuntary. *United States v. Cristobal,* 293 F.3d 134, 140–41 (4th Cir. 2002) (statement taken from defendant on narcotic

painkillers the morning after surgery, but who appeared to be lucid, held voluntary).  Because

Harris-Howell's arrest was lawful and his statements were made post-*Miranda*, the statements

were voluntary and should not be suppressed.

Similarly, Harris-Howell made a free and voluntary statement after his arrest on the instant

matter.  ATF Special Agents Sullivan and Erbe transported Harris-Howell from state custody to

federal custody on March 22, 2019, pursuant to the arrest warrant that issued following the

indictment.  Agent Sullivan recorded the statement made by Harris-Howell during the transport.

*See* Harris-Howell's Recorded Statement, attached as Exhibit 12.  First, Agent Sullivan orally

advised Harris-Howell of his rights pursuant to *Miranda*.  Harris-Howell verbally stated he

understood then and did not have any questions about his rights.  Moreover, he agreed to speak to

the agent regarding the allegations in the indictment.  Candidly, Agent Sullivan did more of the

talking during the interview.  However, Harris-Howell did imply that he sold drugs in Darley Park

by noting that "the younger kids" are making "trouble for those out there"; also, he did not deny

possessing a firearm in August 2018 when asked by Agent Sullivan.  The interview ended abruptly

after about eight minutes.  There was, however, no indication that Harris-Howell was coerced,

induced or promised anything in exchange for his statements.  His request to suppress this

statement should be denied.

## III.     CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO SEVER TRIAL.

Cawthorn and Creek have moved to sever their trials (ECF Nos. 341, 395).  Tunnell,

Keishonne Moore, Grier, and Harris-Howell have moved to adopt Cawthorn's and Creek's

severance motions (ECF Nos. 326 and 333, 379, 389, 451).  Cawthorn focuses on the prejudice a

joint trial poses to his defense; he claims that he can neither adequately cross-examine potential

prejudicial statements made by co-defendants nor call any co-defendants in his defense.  Creek

avers that his minimal participation warrants a separate trial from other co-defendants. Put differently, Creek asserts there is a substantially differing quanta of evidence to be arrayed against his co-defendants. Thus both defendants claim joinder would be prejudicial to their right to a fair trial, thereby justifying severance under Federal Rule of Criminal Procedure 14.

It is well-settled that federal courts prefer joint trials of defendants who are indicted together, absent "special circumstances." *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981); *Zafiro v. United States*, 506 U.S. 534, 538 (1993). Two or more defendants may be charged in a single indictment, even if all defendants are not charged in each count of the indictment, "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. Crim. R. P. 8(b). When a party is properly joined under Rule 8 and is seeking severance, that party must establish that "*actual prejudice* would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted) (emphasis added). Speculative allegations as to possible prejudice are not enough to establish a basis for severance. *See United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978).

Severance is a matter within the trial court's discretion. *United States v. West*, 877 F.2d 281, 287 (4th Cir. 1989). Courts have the ability to sever properly joined trials "or provide any other relief that justice requires" "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Fed. Crim. R. P. 14(a); *Zafiro*, 506 U.S. at 539. Even where actual prejudice is shown, severance is not mandatory; the trial court wields discretion how to best tailor appropriate relief. *Zafiro*, 506 U.S. at 538. Claims of potential prejudice are generally

addressed through limiting instructions rather than severance, which creates an unnecessary burden and inefficiency for the court, the government, and the witnesses by requiring the presentation of the same case on multiple occasions. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### A.      The Defendants are Properly Joined Pursuant to Federal Rule of Criminal Procedure 8(b).

Cawthorn, Creek, Tunnell, Keishonne Moore, Grier, and Harris-Howell are all charged with conspiracy to distribute and possess with the intent to 280 grams or more of a mixture of substance containing a detectable amount of cocaine base (Count One) and conspiracy to use and carry a firearm during and in relation to a drug trafficking crime (Count Two).  Cawthorn, Tunnell, Keishonne Moore and Harris-Howell are also charged with various individual counts involving gun or drug possession on individual dates.  All of the individual counts, however, effectively are overt acts in furtherance of the conspiracy.  As such, all of the counts of the indictment are part of and arise from the conspiracy in which all of the defendants are charged.

As an initial matter, severance should be summarily denied as to Tunnell, Keishonne Moore, Grier, and Harris-Howell, given that their request is made by adoption of an argument specific to the evidence against Cawthorn and Creek.  Stripped of those Cawthorn- and Creek-specific grounds, the adoption motions by Tunnell, Keishonne Moore, Grier, and Harris-Howell are left with general assertions as to why severance is warranted.  Notwithstanding this absence of any specific factual assertions for severance, the attempts by Tunnell, Keishonne Moore, Grier, and Harris-Howell to sever should be denied for the same reasons stated below.

Being alleged as members in the same drug trafficking conspiracy (Count One, in which all of the defendants are charged) and conspiracy to use and carry a firearm during and in relation to a drug trafficking crime (Count Two, in which all of the defendants are charged), the moving

43

defendants are properly joined and should be tried together. *Reavis*, 48 F.3d at 767; *see also United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996) (efficiency and judicial economy support joint trials of co-conspirators). Furthermore, although defendants Creek and Grier are not charged with individual firearm and/or substantive drug distribution counts, Rule 8(b) does not require that each co-defendant be charged with every offense. *Brugman*, 655 F.2d at 543. "Participation" as used in Rule 8(b)'s joinder analysis "does not require 'participation' in each transaction of the series." *Id.* Indeed, a case involving a conspiracy is precisely the type of case in which co-conspirators should be tried together, given that much of the government's evidence will pertain to all defendants and their activities related to the drug trafficking conspiracy. *See Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999). In this case, all of the moving defendants (in fact, all of the defendants overall) are charged together in Count One. Therefore, they are properly joined under Rule 8(b).

### B. Severance is Not Warranted Given the Admissibility of Evidence Against Co-Defendants in a Single Trial, Notwithstanding Differing Degrees of Culpability.

The moving defendants are not entitled to severance simply because evidence against one defendant is stronger than the evidence against another. *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012); *United States v. Zelaya*, 908 F.3d 920, 928-929 (4th Cir. 2018); *Akinkoye*, 185 F.3d at 197. Nor can severance be justified because some evidence admitted against one defendant may not be necessarily applicable to another defendant, a circumstance that Rule 8(b) already assumes may arise. *Brugman*, 655 F.2d at 543.

In this case, the government will introduce evidence at trial of all defendants' involvement in the conspiracy alleged in Count One, which also forms part of the basis of the conspiracy alleged in Count Two and the individual drug trafficking and firearm possession instances in the non-

conspiracy counts.  Therefore, this is not the type of case where multiple defendants "are tried in a complex case…with markedly different degrees of culpability" that would require severance because of heightened prejudice to the defendants.  *Zafiro*, 506 U.S. at 539.  Put another way, for the drug conspiracy, firearm conspiracy, and individual charges related to drug trafficking, the government will present the same evidence to establish the drug trafficking operation alleged in the Superseding Indictment, its participants, its territories, its methods and means, and acts of violence related to its existence.  If severance were granted, the government would essentially be required to present the same evidence at least seven separate trials.  Doing so would create repetitive trials, and would be a completely unnecessary waste of judicial resources.

Here, both Cawthorn and Creek speculate that the admissibility of differing evidence is likely to prejudice their right to a fair trial.  Both defendants fail to identify any concrete evidence that will be admissible as to co-defendants and so prejudicial to Cawthorn and/or Creek that their right to a fair trial will be compromised.  However, even if they did identify such evidence, this is not sufficient to justify a severance.  *See Akinkoye*, 185 F.3d at 197 ("A defendant is not entitled to severance . . . because the evidence against one defendant is not as strong as that against the other.").  Purely speculative and unsubstantiated assertions "that there would be evidence admitted against co-defendants that would be inadmissible against [the defendant], and the spillover effect of the evidence" is insufficient to warrant severance.  *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002).

Instead of the exceptional remedy of severance, the court may address any risk of prejudice through "less drastic measures, such as limiting instructions," which "often will suffice."  *Zafiro*, 506 U.S. at 539; *see also Najjar*, 300 F.3d 466.  There is no reason to believe that proper instructions—as well as separate verdict sheets—in the present prosecution will not adequately

45

safeguard the rights of defendants subject to proper joinder. *Cf. Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions[.]").  In this case, there is no risk of prejudice identified in *Zafiro* that may not be remedied through limiting instructions or other measures.  The United States anticipates that the Court will properly instruct the jury to weigh separately the evidence as to each defendant and there is no reason to suspect the jury will do otherwise.  Further, each defendant will be entitled to his own verdict sheet and ability to argue regarding the evidence specific to him.  Therefore, to the extent evidence may be admissible against some defendants and not others, and the defendants have varying degrees of culpability, a limiting instruction and separate verdict sheets are the proper way to address these concerns.  Thus, this Court should deny the defendants' severance requests.

## IV.   CONSOLIDATED RESPONSE TO MOTION FOR DISCLOSURE OF CO-DEFENDANT AND CO-CONSPIRATOR STATEMENTS.

Tunnell, through his own motion (ECF No. 330), and Cawthorn, Keishonne Moore, Grier, Harris-Howell and Creek, through their motions to adopt (ECF Nos. 340, 379, 389, 451, 396), have requested that the government be required to produce statements made by co-defendants in furtherance of the conspiracy that the government intends to use in advance of trial.  But no defendant has identified a single co-defendant or co-conspirator statement that the movants believe would be inadmissible.

To the extent that the defendants are seeking early designation by the government of co-conspirator statements, disclosure is not mandated by either Federal Rule of Evidence 801(d)(2)(E) or 104(b), and no defendant has cited authority for this early disclosure.  The only requirements governing such disclosure are set forth in 18 U.S.C. § 3500, *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972).  And the Jencks Act prohibits the requested disclosure:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness (other than the defendant) shall be the subject of subpoena, discovery or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a); *see also United States v. Roberts*, 811 F.2d 257, 258 (4th Cir. 1987) (vacating decision of panel that affirmed order by the district court for suppression of co-conspirator statements under 801(d)(2)(E) after the government refused to comply with an order to disclose all such statements).  At this time, the moving defendants have failed to make showing required to trigger pretrial discovery of all statements and documents in the possession of the United States Attorney:  that favorable evidence is being withheld. *See United States v. Harris*, 409 F.2d 77, 80 (4th Cir. 1969).

While not required by law to provide witness statements prior to direct examination, the government has agreed to turn over material defined in 18 U.S.C. § 3500, along with related *Giglio* material—such as plea agreements, criminal convictions, and prior inconsistent statements—no later than one week before trial.  Thus, all defendants will have access to statements of co-conspirators that the government intends to call as witnesses well prior to the time required by statute.  For this reason alone, the motion should be denied.

Furthermore, a pre-trial determination at this time regarding co-conspirator statements is neither necessary nor practical.  A trial court is not required to hold a pre-trial hearing to determine the admissibility of co-conspirator statements.  *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983).  Rather, a trial court may "admit conditionally the declarations of co-conspirators before the conspiracy has been independently established, subject to the subsequent fulfillment of that factual predicate."  *Id.*; *United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992) ("This circuit has rejected the formalistic requirement that there must be a hearing to determine the

existence of a conspiracy before statements can be admitted under Rule 801(d)(2)(E)" but instead "we allow a trial court to conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission"). So long as it can establish the existence of a conspiracy[9] and that the statements made by co-conspirators were in furtherance of such conspiracy, the government satisfies its evidentiary burden, and the statements at issue are admissible. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Moreover, it is practically impossible at this point (approximately five months in advance of trial) for the government to identify which statements will be used at trial. As of the date of this motions response, more than half of the charged defendants have entered guilty pleas, and given the status of ongoing negotiations, it is anticipated that other defendants will plead guilty prior to trial. Therefore, at this point, it would be unduly burdensome for the government to be ordered to designate which co-conspirator statements it intends to use at trial given that it is highly uncertain which of the remaining defendants will ultimately elect to go to trial.

## V.    CONSOLIDATED RESPONSE TO MOTION FOR DISCLOSURE OF EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 404(B) AND 609.

Defendant Tunnell (ECF No. 328), and Cawthorn, Keishonne Moore, Grier, Creek and Harris-Howell, moving through their Motions to Adopt (ECF Nos. 340, 379, 389, 396, 451), have moved to require the Government to disclose its intention to introduce evidence of other bad acts, 404(b) evidence, and or evidence of prior convictions, 609 evidence, that the Government intends offer into evidence.

---

[9] Presently, ten co-defendants have entered guilty pleas (either formally in open court or pursuant to written agreements with a court hearing currently scheduled) to participation in the same charged conspiracy proceeding to trial. While standing alone it is not necessarily sufficient at trial to prove the existence of the charged conspiracy, the fact of these pleas is a prima facie showing of the existence of the conspiracy for the purpose of conditionally admitting the statements without the formalistic requirements of a pre-trial determination of the existence of the conspiracy.

First, the government does not intend to present any 404(b) evidence in this case.  The defendants are charged in drug conspiracy spanning a year.  The bulk of potential "bad acts" during that timeframe would likely be considered acts related to and in furtherance of that conspiracy, and any introduction of acts committed by any defendant outside that timeframe is still pertinent to the charged conduct.  Acts committed outside the charged timeframe are not necessarily "other crimes evidence" because those acts pre-date the charged conspiracy.  *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994).  Indeed, "evidence of uncharged conduct is not considered 'other crimes' evidence if it arose out of the same series of transactions as the charged offense or if it is necessary to complete the story of the crime on trial."  *Id.*  Accordingly, the government reserves the right to present evidence of the defendants' conduct pre-dating the charged conspiracy to the extent that conduct arose out of the same series of transactions charged in the Second Superseding Indictment.

Evidence of "other crimes" should be distinguished from "evidence of uncharged conduct [arising] out of the same series of transactions as the charged offense, or [evidence that] is necessary to complete the story of the crime on trial."  *Kennedy*, 32 F.3d at 886 (approving evidence of criminal conduct involving uncharged individuals which took place a year before the charged conspiracy period, *without* recourse to Rule 404(b)).

Furthermore, should the Court determine that any such act is not within the scope of charged conduct, the government will seek admission of the evidence pursuant to Federal Rule of Evidence 404(b).  The government has produced significant amounts of discovery relating to physical and video surveillance, physical and electronic seizures, and forensic and chemical analysis.  The government does not intend to use any evidence in its case-in-chief that has not been produced in discovery.

As to the defendants' motion pursuant to Federal Rule of Evidence 609, the government does not at this time anticipate introducing evidence within the scope of that rule – barring a decision from one of the defendants to testify.  Specifically, and while reserving the right to revisit this issue through and until the *motions in limine* deadline, the government has reviewed the criminal histories of the remaining defendants and at this time does not expect to introduce in its case-in-chief prior convictions against any defendants except where such convictions inform an element of an offense, e.g., for possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g).  Federal Rule of Evidence 609—which concerns only with the impeachment of witnesses—has no bearing on the admissibility of these convictions to prove the elements of a charged offense.  Even so, should any defendants testify at trial, the government will provide notice of the convictions it intends to introduce for impeachment purposes pursuant to Federal Rule of Evidence 609.

Should the government reconsider any of these positions, it will advise the Court and the defendants in advance of the *motions in limine* deadline.

## VI.   CONSOLIDATED RESPONSE TO MOTION FOR DISCLOSURE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12.

Tunnell, through his own motion (ECF No. 284), and Cawthorn, Keishonne Moore, Grier, Creek and Harris-Howell, moving through their Motions to Adopt (ECF Nos. 340, 379, 389, 396, 451), have requested that the government disclose any information that may be subject to a motion to suppress.

Federal Rule of Criminal Procedure 12(b)(4)(B) has a limited purpose:

Rule 12(b)(4)(B) is not designed or intended to be used to obtain more specific discovery than that provided by Rule 16 nor is it designed to aid the defendant in ascertaining the Government's trial strategy . . . Rather, Rule 12(b)(4)(B) is intended to facilitate efficient suppression motion practice by allowing the

> defendant to avoid filing a motion to suppress when the Government does not
> intend to use the evidence at issue.

*United States v. Barret*, 824 F. Supp. 2d 419, 459–60 (E.D.N.Y. 2011) (internal citations omitted).

*See also United States v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995) (Rule 12(b)(4)(B)'s predecessor Rule 12(d) "was not designed to aid the defendant in ascertaining the Government's trial strategy"); *United States v. Ishak*, 277 F.R.D. 156, 158 (E.D. Va. 2011) ("Put differently, defendants cannot invoke Rule 12(b)(4)(B) 'to force the government to decide precisely which documents provided in discovery it will offer at trial and to prevent it from using any that it does not so designate as a matter of trial tactics.'").

The Rule's "core purpose is to ensure that a defendant '*can make his motion to suppress prior to trial*' by 'requesting the government to give notice of its intention to use *specified evidence* which the defendant is entitled to discover under rule 16.'"  *Ishak*, 277 F.R.D. at 158 (emphasis in original).  Therefore, to trigger Rule 12(b)(4)(B)'s notice obligation, "the defendant's request must identify potentially suppressive evidence with specificity."  *Id.* at 159.  A request should be denied where it is so broad or vague as to seek, in essence, the government's trial strategy.  *See id.* at 159 (denying motion as "insufficiently specific" where defendants requested that the government "designate its evidence and any calls, transcripts, and physical evidence pertaining to the defendant").

Here, Tunnell specifically asked for (1) statements or "admissions by conduct" made by Tunnell, including during any polygraph; (2) items, objects or information received as the product of a search executed by government agents; (3) recordings made pursuant to wiretaps; (4) recordings made pursuant to consensual recordings; (5) pre-trial identification procedures including line-ups; (6) any evidence arguably obtained in violation of federal, state, or local law; (7) grand jury testimony that the government has reason to suspect was perjured; and (8) any other

information or material which might come under this rubric. The government has produced in discovery items that would be responsive to the first and second specific requests. The government is not aware of any information within the scope of the third, fourth, and fifth specific requests. The sixth and seventh specific requests fall within the government's *Brady* and *Giglio* obligations. The government has complied with its *Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials. The eighth request is too broad to comply with the requirements of Rule 12(b)(4)(B), and thus does not follow the purpose of Rule 12(b)(4)(B). Therefore, the eighth request in the motion should be denied as well.

## VII.  CONSOLIDATED RESPONSE TO MOTION TO REVIEW AND CONFIRM WITNESS BACKGROUNDS.

Tunnell, through his own motion (ECF No. 331), and Cawthorn, Keishonne Moore, Grier, Creek and Harris-Howell, moving through their Motions to Adopt (ECF Nos. 340, 379, 389, 396, 451), have requested that the Court compel the government to verify that it has "vetted" and "confirmed" the "backgrounds, qualifications, honesty and other pedigree information" of government witnesses. The government has complied with its *Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials. In addition, the government will turn over *Jencks* material shortly before trial.

## VIII.  CONSOLIDATED RESPONSE TO MOTION FOR BILL OF PARTICULARS.

Creek, through his own motion (ECF No. 394), and Tunnell, Cawthorn, Keishonne Moore, Grier, and Harris-Howell, moving through their Motions to Adopt (ECF Nos. 326 and 333, 340, 379, 389, 451), claim they are entitled to a bill of particulars detailing their involvement in the drug trafficking conspiracy charged in Count One and the firearm conspiracy charged in Count Two. The Court should reject this motion as well.

It has long been the law that criminal defendants are not entitled to a bill of particulars as a matter of right. *Wong Tai v. United States*, 273 U.S. 77, 82 (1927).  Instead, "[a] bill of particulars is a defendant's means of obtaining specific information about charges brought in a vague or broadly-worded indictment." *United States v. Dunnigan*, 944 F.2d 178, 181 (4th Cir. 1991) (citing *United States v. Debrow*, 346 U.S. 374, 378 (1953), *rev'd on other grounds*, 507 U.S. 87 (1993)). As a general matter, an indictment is sufficient if it alleges the essential elements of the crime with which a defendant is charged in a manner that permits the defendant to prepare a defense and plead double jeopardy in any future prosecution for the same offense. *See United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988); *United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1046 (4th Cir. 1987).  As long as the indictment fulfills these purposes, a bill of particulars is unnecessary and its denial does not constitute an abuse of discretion.  *United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985).

Admittedly, the superseding indictment in this case is not lengthy or full of details. However, the government has provided the defendants with hundreds of pages of police reports, cell phone downloads, jail calls, and Instagram and other social media records supporting the allegations, in addition to hours of pole camera video and body worn camera video.  Moreover, while Creek is correct that the majority of the evidence against him comes from undisclosed witnesses due to safety concerns, the government did proffer what those witnesses would say and some general background information about the witnesses.  *See United States v. Bales,* 813 F.2d 1289 (4th Cir. 1987) (holding if the government has an "open file policy," this is taken into account in determining whether the degree of detail known by the defendant is constitutionally adequate).

Where, as here, the indictment fully complies with the requirements of the Fifth and Sixth Amendments and Federal Rule of Criminal Procedure 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Lab., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996). As another circuit has stated:

> A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government investigation . . . Rather; it is intended to give the defendant only that minimum of information necessary to permit the defendant to conduct his *own* investigation.

*United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (citations omitted) (emphasis in original); *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980) (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968) ("[a]cquisition of evidentiary detail is not the function of the bill of particulars").

A bill of particulars is still more inappropriate where, as here, the government has supplemented the indictment with extensive discovery. In this case, the government has provided the defendants, with extensive discovery, including search and seizure affidavits, recordings of jail calls, police reports, lab reports, copies of search warrant affidavits, detailed reports documenting the execution of search warrants and a list of physical evidence seized during the investigation, cell phone downloads, surveillance footage, videos of controlled purchases, and custodial interviews. The government has also met with almost all of the defendants to conduct "reverse proffers" showcasing the government's key evidence, explaining the government's theory concerning each defendant's role in the conspiracy, providing a high-level overview of anticipated testimony by cooperating witnesses at trial, and allowing an opportunity for questions. As the

Fourth Circuit held in *United States v. SIGMA*, 624 F.2d 461, 466 (4th Cir. 1979), such "extensive disclosure by the Government" renders a bill of particulars unnecessary.

The defendants are not entitled to a play-by-play of the government's entire trial strategy, or to the names of the government's witnesses (particularly in a criminal gang conspiracy case with serious witness security concerns).  Therefore, in light of the case law and the specific circumstances of this case, a bill of particulars simply is not warranted and the defendants' motion should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that the Court deny the Defendants' pre-trial motions.

Respectfully submitted,

Robert K. Hur
United States Attorney


By:   _____/s/_____
Patricia McLane
Charles Austin
Brandon Moore
Assistant United States Attorneys
36 South Charles St., 4th Floor
Baltimore, Maryland 21201
Tel.: (410) 209-4800

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of August, 2020, a copy of the foregoing

Response was electronically filed with notice to all counsel of record.


_____/s/_____
Patricia McLane
Assistant United States Attorney